IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:11CR554 |
| | ) | |
| JUBAIR AHMAD, | ) | Honorable T.S. Ellis, III |
| | ) | |
| Defendant | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

## I. INTRODUCTION

1)   On December 2, 2011, defendant JUBAIR AHMAD ("AHMAD") pleaded guilty to a

one-count criminal information charging him with providing material support and resources to a

designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B.   Specifically,

AHMAD admitted that he provided material support to the designated Foreign Terrorist

Organization Lashkar-e-Tayyiba ("LeT") by producing on his computer and then uploading to the

Internet a propaganda video designed to glorify violent jihad and to recruit others to join LeT.[1]

The maximum term of imprisonment for a violation of 18 U.S.C. § 2339B is 15 years.  After

considering the sentencing factors prescribed by 18 U.S.C. § 3553, the government recommends

that the Court sentence the defendant to the maximum penalty of 15 years in prison.  As the

---

[1]  On December 24, 2001, the U.S. Department of State designated LeT a Foreign
Terrorist Organization after determining that LeT committed, or posed a significant risk of
committing, acts of terrorism that threaten the security of U.S. nationals or the national security,
foreign policy, or economy of the United States.   The Department of State redesignated LeT a
Foreign Terrorist Organization on April 27, 2006, and November 24, 2010. Those subsequent
designations included the LeT aliases Jamaat-ud-Dawa (JUD) and Falah-Insaniyat-Foundation
(FIF).

evidence below demonstrates, the defendant has a strong personal commitment to violent jihad that inspired him to provide material support to LeT in numerous ways.  Not only did AHMAD produce the LeT propaganda video (the count for which he pleaded guilty), but he also attended LeT training camps, conspired to recruit others to attend LeT training camps, conspired to raise funds for LeT, and expressed his intention to return to Pakistan to complete the LeT commando training course and be launched on a martyrdom mission.  For these reasons, AHMAD's past criminal conduct and future dangerousness warrant imposition of the maximum penalty available to the Court.

## II.  APPLICATION OF SENTENCING GUIDELINES

2)  The offense of providing material support and resources to a designated Foreign Terrorist Organization is governed by section 2M5.3 of the United States Sentencing Guidelines (Nov. 2011). The base offense level under U.S.S.G. section 2M5.3 is 26.  The defendant acknowledged in his plea agreement that application of the terrorism enhancement under section 3A1.4 is justified in this case.  Accordingly, the terrorism enhancement increases the base offense by 12 for a total offense level of 38.  In addition, the terrorism enhancement increases the defendant's criminal history to a Category VI.  With the defendant's acceptance of responsibility, the offense level is reduced by 3 to a total offense level of 35.  The U.S.S.G. range for an offense level of 35 with a criminal history Category VI is 292 - 365 months.  The maximum term of imprisonment prescribed by 18 U.S.C. § 2339B is 15 years (180 months).  Consequently, with the low end of the U.S.S.G. range at 292 months, the statutory maximum of 180 months is the appropriate sentence in this case.  There are no grounds for the defendant to establish any mitigating circumstances that would warrant a downward departure.

## III.  NATURE AND CIRCUMSTANCES OF THE OFFENSE

3)    The defendant pleaded guilty to a criminal information charging him with providing material support to LeT by producing a propaganda video glorifying violent jihad.  His production and uploading of the LeT propaganda video qualified as material support under the statute because he provided a "service" as well as "expert advice and assistance" to a designated Foreign Terrorist Organization.[2]  AHMAD's material support to LeT, however, was not limited only to the services he rendered to LeT by producing the propaganda video.  He also engaged in separate conspiracies to provide material support to LeT by recruiting others to attend LeT training camps and by facilitating financial donations to LeT.  As relevant criminal conduct, these other conspiracies underscore the fundamental point that the defendant's material support to LeT was not a single, isolated incident  – on the contrary, it was a sustained effort that encompassed a variety of means to support LeT over a period of years.  The three facets of AHMAD's material support to LeT – propaganda, recruiting, and fund-raising – are discussed below.

### Producing an LeT Propaganda Video

4)  In response to direct tasking by LeT, the defendant produced a violent propaganda video designed to recruit other jihadists to join LeT.  On or about September 25, 2010, AHMAD

---

[2]  The definitions for the words and phrases in the material support statutes are set forth in18 U.S.C.§ 2339(A)(b): "(1) the term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials; . . . (3) the term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge."

was contacted by Talha Saeed, the son of Hafiz Muhammad Saeed, the leader of LeT.[3]  Talha

Saeed instructed AHMAD to prepare a video that would contain a prayer by Hafiz Muhammad

Saeed calling for the support of jihad and the mujahideen while a series of violent images were

displayed on the screen.  Emphasizing the importance of this project, Talha Saeed explained that

the video would be popular in Pakistan and would be run continuously on significant programs

and presentations.  AHMAD immediately accepted the tasking, coordinated closely with Talha

Saeed on the concept of the video, and spent the next day constructing the video on his computer.

As noted in the defendant's statement of facts for his plea agreement, after completing the video

he uploaded it to a YouTube account on the Internet.  There it could reach the broadest audience

of supporters and potential recruits for LeT.

5)  The contents of the video reveal that the defendant and Talha Saeed clearly intended it

to promote the cause of LeT and violent jihad.  The video begins with several images of the

leader of LeT, Hafiz Muhammad Saeed, when he was arrested by Pakistani authorities.  During

the video, the LeT symbol or logo is displayed on a number of images (the symbol consists of an

AK-47 assault rifle above an open Koran with the words "Lashkar-e-Taiba" underneath).  In the

audio, Hafiz Muhammad Saeed chants a prayer with refrains such as "O God, support Jihad and

the Mujahideen," "O God give us the glory of Jihad," and "O God, lead the Mujahideen to

victory, who fight for your sake."  He implores Allah to protect the mujahideen and lead them to

victory in Kashmir, Afghanistan, Iraq, Chechnya, and Palestine.  While the prayer plays in the

background, AHMAD incorporates images of violence.  These begin with purported atrocities

---

[3] The U.S. State Department recently offered a $10 million dollar reward for Hafiz
Saeed's capture as part of its Rewards for Justice Program.

against Muslims and they are then followed by images of the mujahideen fighting against enemy forces. These images include graphic photos of dead and mutilated bodies, jihadists firing machine guns and rocket propelled grenades, and improvised explosive devices (IED's) being detonated against what appear to be U.S. and Coalition Forces in Iraq. [Tab A:   English translation of Hafiz Saeed prayer, Communication between AHMAD and Talha Saeed regarding the Hafiz Saeed prayer and selected images from Prayer/Video].[4]

6) The Court should take special note of a recommendation the defendant made to Talha Saeed when they were discussing images to include in the LeT video. At one point in the conversation, AHMAD, using the moniker Rabbi_Zidni_Ilma,  suggested to Talha Saeed that they use an image of Mumbai to show the power of LeT. The mention of Mumbai by AHMAD was undoubtedly a reference to LeT's notorious attack on that city, which was launched on November 26, 2008. During the coordinated commando-style assault, a cadre of LeT operatives killed over 160 people, including six Americans. In determining the severity of the defendant's sentence, the Court should recognize that it was AHMAD who made this suggestion rather than Talha Saeed. His proposal to use an image from the Mumbai massacre to demonstrate LeT's power reveals the intensity of the defendant's commitment to violent jihad and his awareness that LeT was responsible for that deadly attack. [Tab B: Communication between AHMAD and Talha Saeed].

---

[4] Where communications are quoted in this sentencing memorandum, we have attached excerpts of the relevant communications, instead of the entire communications. We did this in the interest of brevity as attaching the entire communications would result in a sentencing memorandum close to 1,000 pages in length.   We have also highlighted the portions in the excerpts that are quoted in this memorandum.

**Recruiting Personnel to attend LeT Training Camps**

7)  In addition to producing a propaganda video to attract new recruits to LeT, the defendant also attempted to recruit individuals to train with LeT.  For example, AHMAD had extensive communications with a young woman, whose initials are MQ, during the past two years.  From September through December 2010, the conversations between AHMAD and MQ largely focused on their conspiracy to recruit her fiancé to join LeT.  AHMAD relentlessly cajoled and prodded MQ to convince her fiancé to attend Dora A'ama (the basic training camp for LeT) and to become a mujahid for LeT.   MQ agreed to try to persuade her fiancé to enroll in LeT training and to become a martyr.  In subsequent communications, MQ recounted for AHMAD her efforts to recruit her fiancé.

**Key Communications**[5]

(A) AHMAD began the recruitment by asking MQ to prepare her fiancé for training. Rather than a direct approach, he advised MQ that whenever she is around her fiancé she should sing inspirational hymns and talk generally about a Muslim's duty to perform jihad. AHMAD, using the moniker

---

[5]  Under the Foreign Intelligence Surveillance Act (FISA), the government obtained court orders authorizing the FBI to intercept thousands of communications associated with the defendant.  The communications were originally in Urdu and Punjabi. FBI language specialists subsequently translated the communications and performed standard quality control checks to ensure the accuracy of the translations.  In the excerpts in this memorandum, the admissions of the defendant are presented in regular font and the statements of those he is communicating with are presented in a smaller italicized font.  Bracketed insertions are additions by the government to clarify references or to protect identities.  Likewise, initials are substituted for full names to protect the identities of uncharged persons.  The date of a particular communication is included in brackets at the end of each excerpt.

ice_fire005@hotmail.com told MQ that she should also note that the training at Dora A'ama only takes 21 days.

- Do one thing, get your fiancé ready for training whichever way can be done. . . have your [fiancé] listen to these anthems plus lectures on jihad . . . Get him ready for training . . . Tell him its only 21 days . . . Jamat Dawa has so many office in Rawalpindi . . . Now its name is Falah e Insaniyat. . . www.fif.org.pk. . . . Tell him Dora Ama is 21 days; make some time. Learn how to pump. . . *I will talk to [him] tomorrow, God willing.* Don't talk directly just like that. Have to get ready. Have him listen to the anthems. Then ask. That what he says. [Tab C: 9/21-22/2010]

(B) AHMAD repeatedly inquired about MQ's progress with recruiting her fiancé to join LeT. MQ replied that she told her fiancé that she prays God provides her with a devout partner, but he is lacking the full understanding and commitment to jihad. AHMAD encouraged her to continue with her spiritual and psychological appeals to motivate him, and AHMAD assured MQ that her fiancé will become a true jihadist after completing Dora A'ama.

- So, did you talk to [your fiancé] again? Played the anthems? *. . . No, Spoke a little bit only . . . I used to think in my heart that O God give me a proper religious follower as a life partner . . .So I said that you [my fiancé] are as God' has willed . . . But there is something lacking . .* . Have him lifted. . .He's going to say that the girl is trying to get him killed . . . *I'm thinking that I will also tell [my fiancé ] . . . when will I feel proud of you?* . . . Right. When you will come back after receiving the training. Prepare him for training, henceforth, he will make up his own mind. . . They manage to convince in 21 days. . . *That over there he will definitely meet people, by meeting them, automatically something will definitely come in his heart for Jihad.* . . 21 days Dora Ama . . . three months Dora Khasa . . . [Tab D: 9/22-2320/10]

7

- Did you speak to [your fiancé] then? . . . *I just talked to him briefly. Again. He does not seem to understand what I am saying* . . .To him show pictures having to do with cruelty. Say it again how great are those people over here to end suffering of others. Come to their help just like Mujahideen came to Afghanistan from Arab. *I did say that blessed are those whose husband, brother are mujahid* . . . Say they give up everything that they have and come over. How good are those people. He will say yes, say again, "You also join them.". . . Then, start the conversation like this. That right now, "We have a chance," there are training camps too, so its time to help our brothers . . . *I told him that we are not just Pakistani, we are Muslims first. And how can you see a Muslim in suffering. I did talk about such things. But he did not understand what I am trying to say.* . . .[Tab E: 9/26/2010]

(C) In response to MQ's frustration with her lack of progress, AHMAD counseled her to be persistent but subtle in recruiting her fiancé. AHMAD reminded her that an indirect appeal is often more effective – she should praise the mujahideen and then suggest her fiancé follow their example by training for jihad.

- Tell [your fiancé] to do Dora Aama before getting married. The entire thing is only 21 days. *Brother now I am going to just say it directly* . . . That after mentioning the mujahideen... Then say that those people came after leaving their homes and belongings from far away . . . *I feel that why should I go around with regards to something that is right. It is a simple matter. Jihad is obligatory.* Actually you are right... See when battle takes place....sometimes conducting a direct attack results in a loss. Attacking indirectly is right. So this way sometimes talking indirectly works out . . . The way I had described. That talk about the Mujahideen then say that you should also do the training, the entire thing is for 21 days . . . [Tab F: 10/20/2010]

(D) AHMAD continued to question MQ on the diligence of her efforts to persuade her fiancé to go for LeT training.  She reported to AHMAD that she had talked to her fiancé about the training as well as martyrdom.  AHMAD commended her for accomplishing this goal and asked if her fiancé agreed to enroll in the training. She replied that he is not sure.

- *. . . I told him [my fiancé ] that training is for twenty one days after that "Khasa Safa" [Dora Khasa] then you would have received missions. Told [my fiancé] about martyrs too.  In short, told him a lot of things. . . So I also told him to pray that we may have death of a martyr.* AHMAD responded that she did a great job today. *[MQ said] Include us among those who die for the religion of God.* AHMAD asked MQ if [her fiancé] agreed to go to the training. *MQ said her [fiancé] did not give a specific answer for that.  She also told him that people of Lashkar-e-Taiba provide training, and [her fiancé responded that] these people are very notorious here.* [Tab G: 11/23/2010]

(E)  AHMAD responded to a request by MQ to provide her with contact information for an LeT madrassa in Rawalpindi.  AHMAD obtained the contact information from an associate in Pakistan.  AHMAD conveyed the information to MQ and told her that her fiancé  will now become a mujahid.

- After receiving the news from HR [AHMAD's associate in Pakistan], AHMAD told MQ that [her fiancé] found the school and will now become a Mujahid . . . AHMAD said the main teacher over there is AK. MQ asked AHMAD if there was a number for AK and AHMAD responded with the same number HR gave him. AHMAD also mentioned

9

> that HR said to give his reference. [Tab H: 11/30/2010]<sup>6</sup>

- AHMAD asked MQ if she asked [her fiancé] about the madrassa and if she told him to give the reference of HR. *MQ confirmed that she told [fiancé] about the reference.* AHMAD said he might not be in his senses himself and wanted MQ to force [her fiancé] to send his brother only over there [to the same madrassa] *MQ responded that he will become a mujahid after going there, God willing.* [Tab I: 12/01/2010]

The defendant's allegiance to LeT can be seen in his interaction with MQ. He spent several months communicating with her in order to develop rapport so that he could recruit her fiancé to train with LeT. AHMAD took a significant additional step by providing contact information for an LeT madrassa in Rawalpindi so that MQ could give it to her fiancé and his younger brother. His purpose was clear – to recruit them to "become Mujahids" for LeT.

**Procuring Funds to Support LeT**

8) Along with his propaganda video and recruiting efforts, another facet of the defendant's material support to LeT was his attempt to raise funds for the terrorist organization. AHMAD had extensive communications with another woman, whose initials are RU. She was on a student visa in a graduate program at Seton Hall University in New Jersey but eventually returned to Pakistan. AHMAD and RU often discussed religious issues, jihad, and LeT. Their conversations ultimately evolved to the point that RU expressed a desire to donate money to LeT, and AHMAD agreed to help her make that donation.

---

<sup>6</sup> This excerpt begins with text messages between AHMAD and HR. It ends with AHMAD communicating the phone number and location for the madrassa in Rawalpindi to MQ by chat.

**Key Communications**

A)  In early January 2011, AHMAD began to communicate with RU about a particular address in Pakistan.  They talked in suspiciously general terms about the address.  He instructed RU to make a temporary email account in which she could receive the address.  These operational security measures indicate the sensitivity of providing the LeT address.

- *Listen, Ice [AHMAD's nickname], give me that address my aunt will give it to them I hope you understand what I am asking* [Tab J: 1/6/2011]

- . . . Yes, you asked about that address. The thing is my darling I can't give you the address from here because it is a sin to give somebody's address.  Do one thing; make a temporary email.  And I will ask Abdullah to have the address emailed to you from Pakistan.  Make the email soon and let me know. [Tab K: 1/7/2011]

B) AHMAD then engaged in a communication via text message with another individual about an address in Karachi, Pakistan.  AHMAD and this individual discussed a person named Abdullah (the same name that AHMAD referenced on January 7, 2011, when he told RU he would "tell Abdullah to email the address to you from Pakistan.").  AHMAD's communication included terms like "job" and "factory" –  code-words that underscore the secretive nature of the type of activities that take place at that address.

- *"Tell a little bit about the factory in Karachi again, that when was it asked?"* AHMAD replied, "You told [the address of the factory] me a long time ago but I have missed placed it. I have a friend who wants to do business with the factory.  I have to tell him (the address of the

11

factory).   Buddy, the factory of yours, you may SMS the address and number for its office in Karachi to Abdullah." *The individual responded that God willing, he would do it to Brother Abdullah tomorrow.* [Tab L: 1/8/2011]

C)  The next day AHMAD contacted Abdullah. This appears to confirm the fact that AHMAD had expected the other individual to send "Brother Abdullah" the "address of your factory." They referred to RU by her nickname "Inc."

- AHMAD asked Abdullah if he had received the reply. *Abdullah indicated that he had not. Abdullah provided an email address and said that was the ID of "Inc."* [RU's nickname]. AHMAD asked if Inc had given him [Abdullah] that email address.  *Abdullah confirmed that she had. Upon Abdullah asking what he should say [to Inc]* AHMAD responded that HR would send him [Abdullah] an SMS. AHMAD then instructed Abdullah to send it on this ID. AHMAD then explained to Abdullah that she wants a job in the factory.  *Abdullah asked, "In 'Al Nisa' wing? The female department, I mean."* AHMAD responded in the affirmative. [Tab M: 1/9/2011]

D)  AHMAD and HR then tried to coordinate this effort.  HR confirmed that he had given the address to Abdullah. AHMAD told HR that he had a friend who wanted to invest money in a partnership – in other words, donate funds to LeT.

- AHMAD called HR by telephone and told him that apparently Abdullah doesn't know the address anymore and has forgotten it . . . *HR said that the location is right in front of the gate of famous Safari Park in Karachi and is called Jamia Derasat.* AHMAD indicated that he knows that much but would prefer to get a phone number that could be called and said that his friend is going to return [to the USA] by the 20th [of January] and said that HR must give AHMAD the number

12

before that. AHMAD again stated that his friend would like to make some monetary investment and start a business. AHMAD said "she is well to do and will potentially make good investment." [Tab N: 1/12/2011]

E) AHMAD then re-contacted Abdullah to obtain the address for RU. In the course of their conversation, AHMAD Googled the information that Abdullah gave him, and AHMAD discovered references to a particular location in Karachi identified with LeT/JUD.

- Shortly after the telephone call with HR, AHMAD communicated with Abdullah. AHMAD asked Abdullah to tell him the name of Jamia so that he can find the phone number. *Abdullah responded, "Jamia Dirat."* AHMAD proceeded to Google "Jamia Diraat" and told Abdullah that he did not come up with the correct webpage . . . *Abdullah stressed, "Buddy, it is Jamia Dirat, opposite Safari Park, Karachi Highway*. . . AHMAD Googled "phone Jamia Darasat al-islami" and found a webpage of Jamia al-Darasat (Islamic University) (Karachi). The webpage had a post by "Jihaadistan" that read. "Islamic Univercity mujahdeen lashkar taiba ka markaz hay 0214979621." [Tab O: 1/12-13/2011]

F) In the course of their communication, AHMAD and Abdullah let their guard down for a moment when AHMAD tells him that their activities will support Inc or spying.

- AHMAD replied to Abdullah, "02 14979621"and asked if 021 was the [city] code for Karachi. *After Abdullah replied "yes,"* AHMAD said, "it says, University road." *Abdullah scolded AHMAD saying, "By the way uncle, don't give me the number to someone else's house."* AHMAD responded with the address, "Jamia Darasat al-Islamia, opposite Safari park in Gulshan-e-Iqbal . .

13

. AHMAD then said to Abdullah that Inc will either support or spying. [Tab P: 1/13/2011]

- During his conversation with Abdullah, AHMAD was simultaneously researching for more information on Jamia Darasat. He accessed articles titled. "Banned terrorist outfits resume activities in Karachi," and "Lashkar-e-Tayiba is ready to hit again." In the second article, written 28 November 2010 by WEHATEPAKISTAN. BLOGSPOT.COM, the author wrote, "Lashkar and its parent organization, the Jamaat-ud Dawa. have managed to hoodwink the world by calling itself Tanzeem Falah-e-Insanyiat (TFI or FIF)'. which incidentally operates from the same premises which was, until November 2008, occupied by Jamaat-ud Dawa's Islamic centers." The article continued, "Saeed (Hafiz Saeed), his son Talha Saeed, brother-in-law Abdur Rahrnan Makki and son-in-law Khalid Waleed either lead the prayers or promote and defend the group's ideology and the need for Jihad to free Kashmir from this mosque . . . The author continued, "In Karachi, the group runs its operations from Jamia Darasat al-Islamia –a sprawling complex." [Tab Q: 1/13/2011]

G) On January 16, 2011, AHMAD contacted MQ. He recounted his efforts to get RU the address for LeT so that she could donate money ("Gul" is another alias for RU). AHMAD also stated that HR had cautioned him to be careful because RU could be a spy.

- AHMAD chatted with MQ. *She said that "Gul is about to come then.:D."* AHMAD told MQ that Gul hadn't e-mailed for a few days and said that she had asked for an address of Jamat office and said that she wanted to give money. AHMAD explained to MQ the instructions he told Gul including making a new "temp"email and having Abdullah send the address to the temporary email address and told her that he could not give the address from here. [ Tab R: 1/16/2011]

14

## IV.  HISTORY AND CHARACTERISTICS OF THE DEFENDANT

9)  The defendant was born and raised in Pakistan.  He is an intelligent and articulate young man who has earned his living as an electrician. He has no known history of medical or mental health issues that could mitigate his responsibility for the criminal conduct outlined above.   In reviewing his background, the most significant influence on the defendant appears to have been his indoctrination and training by LeT during his teenage years in Pakistan.

### Attendance at LeT Training Camps

10)  Prior to his arrival in the United States, AHMAD attended a series of LeT training camps in Pakistan.  LeT training is organized into three stages of instruction.  First, a recruit will attend Dora Suffa for a religious indoctrination course (3 weeks).  At Dora Suffa the recruit will be taught LeT's interpretation of the fundamental tenets of the Ahl-e-Hadith faith.  Next, a recruit will attend Dora A'ama for the basic military course (3 weeks).  Dora A'ama consists of weapons instruction, physical training, and additional religious education. Then, if selected for the third stage of LeT training, a recruit will attend Dora Khasa for the commando course (3 months). Dora Khasa provides training in weapons, guerilla warfare tactics, and survival techniques. According to his own admissions in a number of intercepted communications, AHMAD enrolled in all three LeT training courses.   However, he did not progress far in the commando training course at Dora Khasa because an instructor concluded he was too young. The instructor told him to go to Muridke[7], to study, and then to come back to complete Dora Khasa.

---

[7] The location of a large campus and training facility run by Jammat Ud Dawa (JUD) located in Muridke, Pakistan.

**Key Communications**

A) AHMAD discussed Dora A'ama and the general nature of training there.

He also provided a physical description of the layout of the training camp.

- When the Dora [A'ama] tour was completed at that time you are in a rush to come back home, lolz. But after coming back there is effort for the next Dora [Khasa] . . . we are away from home for about 22 days . . . over there, have to roll in dirt . . . It's training brother! It's not of grandma's house. Out in the jungles . . . listen to lectures, offer prayers, exercise [sic], study the guns, fire them. . . the training camp is like a settlement. There are houses on one side, mosque on one side, and open field in the middle where training takes place. . . but where I got the training from they do the commando training there now. [Tab S: 6/16-17/2010]

B) AHMAD then discussed Dora Khasa and the instructor who sent him back. The fact that AHMAD said he was sent back from Dora Khasa because he was too young suggests that he was telling the truth when he said this. If he was just posturing as a jihadist to impress others online, he would never have admitted that he was rejected. Rather, he would have claimed that he completed the commando course at Dora Khasa.

- This lecture is by the guy who had sent me back . . . Every guy goes through him. All of those who go to Kashmir. . .interestingly this guy is a very good friend of mine too . . . He said you should do this. That go and get admission in "Muredkay" for now, study there then come back after studying a little. . .AHMAD then stated that Mureedkay madrissa belongs to Jamaat Dawa.. Very big. I have been there. I was young. For commando training person must be fit . . .Those who do commando training they get very smart . . . its

16

very tough training . . . Yea I was 18+ skinny bodybuilder . . . He said it's my suggestion that you may study now . . . most of them [instructors] are former-fighters, some from Afghan jihad, some from Kashmir jihad . . . [ Tab T: 6/16-17/2010]

C) In separate conversations with two additional people, AHMAD recounted how he attended Dora A'ama and Dora Khasa. These excerpts demonstrate the consistency – and, thus, reinforce the credibility – of his statements that he attended the LeT training camps.

- I had gone to do the Khasa. Brother Nisar sent me back. He said, "You are too young right now." . . . There was a lot of enjoyment [there]. . . *Yes, do you intend to try it again?* . . .God willing . . . [Tab U: 7/24/2010]

- *[AS] tells AHMAD after his matric [high school] he went for Dora A'ama and Dora Sufa*. . . AHMAD says he has done Dora Amma too.  AHMAD says he wanted to do Dora Khasa but brother Nasar suggested he go to Muridke and study for now, then do it.  [Tab V: 10/03/2010]

D)  AHMAD identified the completion of Dora Khasa training as a key goal in his future plans. AHMAD's statement reflects his determination to complete the course in order to qualify for training to conduct a martyrdom mission - being "launched" in his words.

- Thinking abt [about] my future. What I'll do, and what not to do?. . . I have to get married, I have to make the dora "tour" [Dora Khasa], [I ]have to be launched too [The word "launch" refers to an operative being deployed on a terrorism mission.] [Tab W: 1/24-25/2011]

17

**Criminal History**

11)  Although the defendant has no criminal record, the Court should not consider this a mitigating factor in determining his punishment.  As noted previously, the terrorism enhancement under U.S.S.G. § 3A1.4 mandates that the defendant's criminal history be increased to the maximum, Category VI.  This provision of the Sentencing Guidelines embodies the judgment that terrorism offenses are particularly dangerous and deserve severe punishment.  Furthermore, when assessing the need to protect the public in crafting an appropriate sentence, courts have recognized that terrorists present a special risk of danger because of their often fanatical devotion to violent causes.  *See United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003)("even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.").

## V.  NEED FOR SENTENCE TO REFLECT THE SERIOUSNESS OF THE OFFENSE

12)  The defendant committed an extremely serious crime by providing material support to a designated Foreign Terrorist Organization.  Although he conducted his jihad with a computer rather than an AK-47, AHMAD's criminal actions were nonetheless designed to support LeT's mission of waging violent jihad against those they consider to be the enemies of Islam.  In simple terms, AHMAD committed a crime of violence – and the severity of his punishment should take into account the violent nature of this terrorism offense.  Moreover, terrorist organizations such as LeT are becoming increasingly dependent on cyber jihadists like the defendant to sustain their operations.  Indeed, in this era of the Internet, AHMAD was at the center of LeT's efforts to disseminate propaganda, attract new recruits, and raise funds online.  By posting the propaganda

video on-line, AHMAD committed an act that ensured that it could be viewed by a wide audience. There is virtually no limit to how long that video will be available to aspiring jihadists. Even if the video is no longer on YouTube, there is no way to know who may have downloaded it in order to use it as a recruiting tool. The possibility remains, that even years from now, the defendant's actions on behalf of LeT will continue to attract recruits for this Foreign Terrorist Organization.

**Providing Material Support to a Terrorist Organization is a Crime of Violence**

13)    Because the defendant was on the computer at his home in Virginia when he committed the crime, some may discount or diminish the seriousness of this offense. The simple fact is that providing material support or resources – in any form – to a terrorist organization is a crime of violence. The Court previously addressed this issue in *United States v. Lindh*, 212 F.Supp.2d 541 (E.D. Va. 2002), where it held that 18 U.S.C. § 2339B constitutes a crime of violence in the context of 18 U.S.C. § 924(c) (using and carrying a firearms and destructive devices in furtherance of crimes of violence):

> Count Four charges Lindh with conspiring knowingly to provide material support and resources to a foreign terrorist organization, namely al Qaeda, in violation of 18 U.S.C. § 2339B, Count Five charges the substantive offense, also in violation of Section 2339B. Both of these crimes are, by their nature, crimes of violence. Providing material support or resources to a terrorist organization – which may include "weapons, lethal substances, [or] explosives," but may be just as deadly if it is "currency or monetary instruments – is categorically a crime of violence, as Congress recognized when it enacted 2339B. Furthermore, Congress was clearly mindful of the violent nature of this crime because it imposed greater penalties "if the death of any person results." (citation omitted). Simply put, when one provides material support or resources to a terrorist organization, there is a "substantial risk that physical force against the person or

19

property of another *may* be used in the course of committing the offense (citation omitted) . . . It takes little imagination to conclude that providing material support and resources to a terrorist organization creates a substantial risk that the violent aims of terrorists will be realized. Violence, therefore, is intrinsic to the crimes with which Lindh is charged.

The defendant knew full well that the core mission of LeT was to inflict violence on its adversaries by engaging in terrorist operations. During one conversation with MQ, AHMAD characterized LeT as "the mass murder wing of JUD." [Tab X: 3/8/2011 ]. That blunt description of LeT should leave no doubt as to the serious nature of AHMAD's crime in providing material support to this deadly terrorist organization.

### Critical Role that Cyber Jihad Plays in Terrorist Organizations

14) The use of the Internet by terrorists and terrorist organizations has increased dramatically over recent years. Experts in the field of national security and terrorism consider the Internet an indispensable tool which terrorist organizations are now exploiting to their full advantage. The broad range of these terrorist activities on the Internet was highlighted by the Chief of the Action against Terrorism Unit, Office of the Secretary General, Organization for Security and Cooperation in Europe:

> . . . the Internet is today one of the principal means whereby terrorist organizations disseminate propaganda, indoctrinate followers, recruit and train new operatives. There are websites regularly visited by tens of thousands of persons where prominent terrorist literature is made available and terrorist acts glorified. There are websites through which "leaders" interact directly with their supporters, creating social bonds and maintaining virtual communities, all of which can be later exploited to mobilize support. There are websites hosting virtual training camps as well as online manuals on how to assemble an explosive belt for instance or to create an explosive with every day life

> materials.  The Internet is also one of the principal means by which terrorists can raise and transfer funds and other material resources.

"Terrorist Use of the Internet: Threat, Issues, and Options for International Co-operation," Address by Raphael F. Perl to the Second International Forum on Information Security (April 7, 2008). [Tab Y]

15)    Internet sites such as YouTube have garnered particular attention from terrorist organizations because they reach such a large audience worldwide.  Evan F. Kohlmann, a recognized specialist on the use of the Internet by terrorist organizations,  has been qualified as an expert witness in twenty-one cases in federal district court.  Called to testify before the House Committee on Homeland Security last year, he submitted a written statement entitled, "The Antisocial Network: Countering the Use of Online Social Networking Technologies by Foreign Terrorist Organizations." In his statement Mr. Kohlmann focused on the growing importance of social media platforms such as YouTube to Foreign Terrorist Organizations.

> Yet, perhaps what is most startling about this phenomenon is the sharp increase in the use of brand name U.S. commercial social networking services such as YouTube, Twitter, and Facebook by terrorist organizations and their supporters.  On password-protected top-tier Al-Qaida web forums, contributors are boasting that "YouTube is among the most important media platforms in supporting the mujahideen, as it is ranked third in the world with more than 70 million daily visitors."  This is reflected in the increasing occurrence of hardcore jihadi videos hosted by YouTube as evidenced in federal terrorism cases.

Hearing on "Jihadist Use of Social Media – How to Prevent Terrorism and Preserve Innovation" before the House Committee on Homeland Security, 112th Cong. (2011)(Statement of Evan F. Kohlmann, Senior Partner, Flashpoint Global Partners). [Tab Z]   Kohlmann specifically cited the

21

LeT video that AHMAD produced and uploaded on YouTube as an example of this alarming trend (along with three other recent prosecutions for terrorists who placed videos on YouTube to promote violent jihad).

## VI.  NEED TO PROTECT PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT

16)  The defendant poses a serious threat to the general public.  He has repeatedly expressed his zeal for violent jihad and his commitment to the mission of LeT.  In a series of communications, AHMAD stated his desire to complete the LeT commando course, to be launched on a terrorist operation, and to die the death of a martyr.

- In a communication with his fiancee on May 27, 2010, the defendant stated that, "I want to get married and also may Allah give me the death of a martyr." [Tab AA]

- In a communication on October 3, 2010, the defendant told an associate he "will do with 72" and "God willing, next year will [be] with 72." [Seventy-two refers to the belief that a jihadist who has died a martyr's death will be rewarded with that number of virgins in heaven.]. In response, the defendant's associate declared, *"May Allah reward you brother."* [Tab BB]

- In a communication on January 25, 2011, the defendant told another associate "I have to get married, I have to take the tour." [The word "tour" is commonly understood to mean the completion of a terrorist training camp.] The associate replied, *"Then what were you thinking?"* The defendant answered, "I have to be launched too." [Tab CC]

These communications underscore the defendant's personal commitment to the most extreme form of violent jihad – martyrdom missions.

17)  In addition to his personal desire for martyrdom, the defendant encouraged others to follow the path of violent jihad.  For example, during a conversation between AHMAD and RU,

she asked him if girls could do jihad. He responded, "Yes, nowadays in Palestine girls do jihad. One girl destroyed the entire bus full of Jews by doing a suicide attack. May Allah accept her struggle." [Tab DD: 10/17/2010]. AHMAD also instructed her to search the Internet for Anwar Al Awlaki's "44 ways to support jihad," and he sent her the LeT manifesto "Why Are We Performing Jihad" [Tab EE: 9/7/2010 which contains selected excerpts, with English translations, from the LeT manifesto]. Anwar Al Awlaki is the deceased leader of Al-Qaeda in the Arabian Peninsula (AQAP), who was associated with a number of high-profile terrorist operations such as the attack on Fort Hood by Major Nidal Hasan and the foiled bombing of an airliner over Detroit on Christmas day by Umar Farouk Abdulmutallab.

## VI. CONCLUSION

18) For his criminal conduct in providing material support and resources to LeT the defendant has earned the maximum penalty of 15 years in prison. AHMAD's efforts to further the deadly aims of this designated Foreign Terrorist Organization – through violent jihadist propaganda, recruiting, and fund-raising – represent a serious danger that cannot be mitigated simply because he was on a computer when he committed these unlawful acts. In addition, AHMAD has clearly indicated his desire to return to Pakistan to complete his LeT commando training and then be launched on a martyrdom mission. His virulent dedication to LeT and violent jihad is evident in numerous communications intercepted by the government and highlighted above. To punish the defendant for this terrorism offense and to protect the public from future

crimes by the defendant, the government requests that the Court impose the maximum sentence of

15 years in prison.

Respectfully submitted,

Neil H. MacBride
United States Attorney


By:                    /s/
W. Neil Hammerstrom, Jr.
Assistant United States Attorney
Virginia Bar No.  24588
Counsel for the Government
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3755
(703) 299-3982 (fax)


John T. Gibbs
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice

24

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 3, 2012, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will then send a notification of such filing

(NEF) to the following:

> Counsel for Defendant
> Brian L. Mizer, Esq.
> Aamra S. Ahmad, Esq.
> Assistant Federal Public Defenders
> Office of the Federal Public Defender
> 1650 King Street, Suite 500
> Alexandria, VA 22314

By: _____/s/_____

> W. Neil Hammerstrom, Jr.
> Assistant United States Attorney
> Virginia Bar No. 24588
> Counsel for the Government
> United States Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, VA 22314
> (703) 299-3755
> (703) 299-3982 (fax)