**IN THE UNITED STATES COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

UNITED STATES OF AMERICA )
                                        )
v. )         **Criminal No. 1:11-CR-554**
                                          )
                                          )         **Sentencing Date: April 13, 2012**
JUBAIR AHMAD, )
                                          )         **The Honorable T. S. Ellis, III**
                                          )
                   **Defendant.**   )

## DEFENDANT'S POSITION WITH REGARD TO SENTENCING FACTORS

Pursuant to Rule 32 of the *Federal Rules of Criminal Procedure* and section 6A1.3 of the advisory *United States Sentencing Guidelines* (U.S.S.G.), the Defendant, Mr. Jubair Ahmad ("Mr. Ahmad"), by counsel, states that he has received and reviewed the Presentence Report ("PSR"). Mr. Ahmad offers no objection to the Probation Officer's calculation of the advisory Guidelines range of 180 months (restricted) as reflected in the Presentence Report ("PSR"). Nevertheless, Mr. Ahmad respectfully asks the Court to impose a sentence of 24 months of imprisonment, which is sufficient, but not greater than necessary, to comply with the purposes of sentencing enunciated by Congress in 18 U.S.C. § 3553(a)(2).

## BACKGROUND

Mr. Ahmad was born on the Fourth of July 1987, in Sialkot Pakistan. When he was three, his parents applied for a visa for the family to immigrate to the United States. The visa was granted sixteen years later, and on February 19, 2007, Mr. Ahmad and his family immigrated to the United States. PSR at ¶ 49. After arriving in Virginia, Mr. Ahmad worked hard as an

electrician.  PSR at ¶ 60.  He paid his taxes, joined the International Brotherhood of Electric Workers Local Union 26, and bought a car.  PSR at ¶ 60-63.  Those who know Mr. Ahmad in the world outside of the internet know him to be "an honest, law abiding, hard working [man who] would never hurt anyone."  Letter from Bruce Miller dated March 30, 2012 (Attachment B).

But having come to the United States at age 19, and with few cultural ties to America, Mr. Ahmad spent much of his free time on the internet in Pakistani forums.  Mr. Ahmad does not dispute that some of his speech on the internet in these forums was intolerant and, in general terms, advocated violence, almost exclusively against the Indian army in Kashmir.  Nor does he dispute that, in the wake of *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010), his speech could be proscribed.  But this case, which appears to be among the first prosecutions of its kind and the direct result of *Humanitarian Law Project*, cannot be taken out of the context of Mr. Ahmad's law abiding conduct offline, his upbringing in Pakistan, the ongoing conflict between Pakistan and India over the disputed region of Kashmir, and Pakistan's state-sponsored use of groups like Lashkar-e-Tayyiba to counter India's overwhelming military superiority.

The border between India and Pakistan has been called, "The World's Most Dangerous Border."  *The Economist,* The World's Most Dangerous Border, May 19, 2011 (Attachment C).  And Mr. Ahmad's hometown of Sialkot lies within its shadow.  India and Pakistan have fought three major wars since the partition of British India.  In fact, partition was founded in the belief that Muslims and Hindus could never live together.  *Storming the World Stage, the Story of Lashkar-e-Taiba*, Stephen Tankel 12 (2011).   The two countries have fought since their inception over the accession of the princely state of Jammu and Kashmir to India in 1947.  The current

border, or "Line of Control," has remained virtually the same since a cease fire was signed on January 1, 1949, with Pakistan controlling roughly one third of the disputed territory and India the remaining two thirds. STEPHEN TANKEL, STORMING THE WORLD STAGE, THE STORY OF LASHKAR-E-TAIBA 48 (2011).

Following the cease-fire, Pakistan continued to send guerillas into Indian-administered Kashmir, a practice that has continued on and off for more than six decades. *Id.* at 49. Pakistan launched a full-scale invasion of Kashmir in August 1965, but when an Indian counterattack threatened Pakistan itself, another ceasefire was reached. The two sides returned to their previous positions along the border. *Id.* at 50. Five years later, India intervened in the civil war between East and West Pakistan. The Indian military's decisive defeat of the Pakistani military led to the new state of Bangladesh and formal transformation of the ceasefire line into the Line of Control.

According to one expert on LeT, one consequence of Pakistan's defeat was to reinforce the idea of using proxies to avoid ever again directly engaging the Indian military. *Id.* A second consequence was to leave Pakistan wanting revenge for India's second partition of its territory. *Id.* One of the groups Pakistan turned to in its proxy war with India was LeT. When violence erupted along the border again in the late 1990's, members of Pakistan's intelligence service, the Directorate for Inter-Service Intelligence ("ISI"), coordinated and planned LeT's strikes against the Indian army in Kashmir. *Id.* at 61. These attacks again resulted in war in the summer of 1999. Again, a massive Indian counterattack brought the parties to the negotiating table. *Id.* at 63. It was during this conflict that LeT began a series of Fidayeen attacks, which were "launched" from Pakistan. *Id.* These attacks are made by 3-5 men assaulting security camps where Indian police or

soldiers are stationed. *Id.* "The objective of Lashkar's fidayeen attacks was not for the fighters to be martyred right away, but to inflict as much damage as possible on the enemy in order to inspire fear in others." *Id.*

Despite the most recent cease-fire, sporadic violence continued with LeT attacks on an army garrison located at Dehli's Red Fort in late 2000. *Id.* at 65. In 2002, approximately 2000 Muslims were murdered in a pogrom in the Indian state of Gujarat with the collusion of local police and senior members of ruling political party, the Hindu nationalist Bharatiya Janata Party ("BJP"). The Economist, *Murder Most Common,* July 29, 2010 (Attachment D). In 2007, a Hindu terrorist group planted bombs on the Samihauta Express train as part of its "bomb for bomb" campaign. India Today, *Samihauta blasts: NIA chargesheets Aseemanand, 4 others*, June 21, 2011 (Attachment E). The bombers targeted the train because it was known to carry Pakistanis, and 68 people were killed in the blasts. *Id.* In 2008, LeT departed from its usual practice of attacking "military targets" and attacked the city of Mubai in India killing 170 people. In summary:

> The border between India and Pakistan has seen a bloody partition in 1947 that killed hundreds of thousands; more than 15, 000 dead in three wars and 25 years spent fighting over a glacier; 40,000-100,000 dead (depending on whom you believe) in the insurgency in the disputed province of Kashmir. And now both countries are armed with nuclear weapons.

(Attachment B).

More than perhaps anywhere else in the world, this ongoing conflict is seared into the collective conscience of the people of Pakistan and India. "Every Pakistani is subjected from childhood to propaganda on Kashmir, in school as well as in the family and through the official

media." MARIAM ABOU ZAHAB, THE PRACTICE OF WAR 140 (2007).  "The cumulative effect of this propaganda has a strong impact on teenagers, who see every day on TV Indian soldiers beating Kashmiris and hear the most horrible stories of children burnt alive or slaughtered in front of their mothers, who are then forced to drink their blood, and especially stories of girls and women raped by Indian solders in front of their menfolk." *Id.*  This environment has allowed groups such as LeT to flourish in Pakistan.

LeT, and its charitable incarnations or fronts Jamaat-ud-Dawa ("JUD") and Falah-i-Insaniyat Foundation ("FIF"), operate openly in Pakistan.  The groups' leader, Hafiz Saeed, moves about freely in Pakistan and, as recently as April 4, 2012, he gave a press conference at a hotel in Islamabad.  While LeT was officially banned by President Musharraf in 2002, JUD and FIF remain legal organizations in Pakistan. STEPHEN TANKEL, STORMING THE WORLD STAGE, THE STORY OF LASHKAR-E-TAIBA 236 (2011).   The group operates a Department of Media and Propagation and publishes a widely circulated newspaper.  *Id.* at 80.  It maintains websites in Urdu, English, Arabic and Sindhi, and operates a web-based radio station.  *Id.* at 80.

The group has received financial assistance from the Pakistani army and the ISI, but it also maintains a vast financial network within the country.  *Id.* at 86, 134.  JUD donation boxes are in countless shops in Pakistan.  *Id.* at 86.  It collects "taxes," and members of the business community sometimes add 5-10 additional rupees to the bill "for the jihad" when selling goods. *Id.* at 87.

The group maintains offices at its official headquarters in Lahore and satellite offices elsewhere in Pakistan, but much of its operations are conducted out of a sprawling compound in

Muridke. *Id.* at 69. The annual congregation at the compound was said to draw between 500,000 and 1,000,000 Pakistanis by the late 1990's. *Id.* at 81. The compound is surrounded by farmland and employs farmers, gardners, cooks, and teachers. *Id.* The group also operates a local hospital that operates ambulances bearing JUD markings. *Id.* at 71. With sixty-six ambulances, the group operates the second largest ambulance fleet in the country. *Id.* at 132. Outside of Muridke, the group operates ten other dispensaries in Muzaffarabad, Lahore, and Sindh Province, all of which offer medical check-ups and medication. *Id.* at 72. During natural disasters, such as massive flooding in 2010, or an earthquake in 2008, JUD established field hospitals, and used its manpower to distribute U.S. relief aid and even reportedly ferried NATO soldiers across local rivers. *Id.* at 137. It also worked closely with the World Food Program, World Health Organization, United Nations Children's Fund, and the Red Cross to deliver supplies. *Id.* Six months after the earthquake in 2008, the United States designated JUD a foreign terrorist organization. *Id.* at 138.

In addition to medical clinics, JUD also operates a school system, which by 2001 included 127 schools with 15,000 students and 800 teachers. *Id.* at 72. One focus of the curriculum at these schools is jihad. *Id.* at 73. Schooling also includes swimming, mountaineering, wrestling and martial arts. *Id.* at 74. As children grow older, they may be sent by their parents to additional religious training such as Daura-e-Aama and Daura-e-Suffa. *Id.* at 75. LeT offered these courses to "anyone regardless of sect and used them as an opportunity to convert people to the Ahl-e-Hadith faith." *Id.* at 76. Each of these courses lasts three weeks and, at Daura-e-Aama, recruits are given basic weapons familiarization and allowed to shoot small arms. "Those who wished to

receive serious military training..." would have to wait for an advanced course, Daura-e-Khasa. *Id.* at 74, 77. Like many other Pakistani adolescents, Mr. Ahmad attended Daura-e-Suffa and Daura-e-Aama when he was 14 and 15.

In some respects, these initial camps are not unlike paramilitary training for adolescents in the west like the Boy Scouts or the Soviet Pioneers. According to the Boy Scouts of America, "Scouting is an educational program based on 'duty to God'...."[1] Boy scouts swear an oath to God and country, and can earn merit badges in archery, bugling, climbing, canoeing, rifle shooting, and wilderness survival.[2] The rifle shooting merit badge requires basic weapons familiarization, operation, and marksmanship. *Id.*

"Not everyone who completed Daura-e-Khasa and the Daura-e-Suffa advanced to the Daura-e-Khasa for military training." STEPHEN TANKEL, STORMING THE WORLD STAGE, THE STORY OF LASHKAR-E-TAIBA 76 (2011). If a person wants to attend basic military training at Daura-e-Khasa, he must obtain a letter of recommendation for the local LeT office and present it to the administrative office at the camp. *Id.* The PSR wrongly states Mr. Ahmad was accepted into Dora Khasa. PSR at ¶ 12. Although he had a letter of recommendation, he was never accepted into the training course because he was too young and too skinny. He spent a week at the administrative office before being sent away. His family then immigrated to the United States.

When Mr. Ahmad immigrated to the United States, he could not speak English. Like many immigrants, he sought out members of the Pakistani community. In Mr. Ahmad's case, he spent much of his time with the online Pakistani community. Of more than four years of conversations

---

[1]http://www.scouting.org/scoutsource/Media/Relationships/ChaplainRole.aspx.
[2]http://www.scouting.org/scoutsource/BoyScouts/AdvancementandAwards/MeritBadges.aspx

online and over the telephone, the government invites this Court's attention to two series of conversations with two different women as well as to the conversation with Talha Saeed that is the basis of Mr. Ahmad's conviction.  The government speaks ominously of Mr. Ahmad's communications with a Pakistani student attending Seton Hall University, and her desire, while back in Pakistan,  to assist her aunt, also living in Pakistan, with donating money to JUD. Government Position at 10-12.  The government points out Mr. Ahmad used code words, but it neglects to mention Mr. Ahmad and his online Pakistani friends also openly referred to the JUD seminary by its actual name, Jamia al Dirasat Islamia.  Government Position at 12.  He also noted it was across from the famous Safari Park in Karachi.  On June 21, 2011, a little more than two months before Mr. Ahmad's arrest, JUD held a conference at that seminary.



This photo of the conference and the seminary is available on the internet.[3]  The government correctly notes Mr. Ahmad gathered information on the seminary, a "sprawling complex" with a mosque, school, hostel and office, from the internet.  Government Position at 14; Tab Q.  It is perhaps understandable that Mr. Ahmad did not appreciate the gravity of providing such publicly available information to the Seton Hall graduate student.

Mr. Ahmad also communicated with a women about having her fiancee attend the same basic training, Dora-e-Aama, he attended at age 15.  Government Position at 7.  He spoke openly about jihad and martyrdom, but he never discussed or advocated specific acts of violence or terrorism.  While such discussions are commonplace in Pakistan, Mr. Ahmad's open discussion of these topics reflects his failure to appreciate potential criminality of doing so in the United States.  Such discussions, like LeT itself, are, at the very least, indirectly promoted by elements of the Pakistani state in its proxy war with India.

It was in an online Pakistani forum that Mr. Ahmad was contacted Talha Saeed, the son of LeT founder Hafiz Mohammad Saeed.  The two men discussed making the video at issue in this case.  Mr. Ahmad created the video from still photos and video clips found on the internet.  Mr. Saeed suggested edits, and Mr. Ahmad made some of the edits and ignored others.  PSR at ¶ 14; Government Position Tab B.

On December 2, 2010, Mr. Ahmad pleaded guilty to Provision of Material Support to a Designated Foreign Terrorist Organization in violation of 18 U.S.C. § 2239B.  The Court continued his case for sentencing on April 13, 2012.

---

[3]http://tribune.com.pk/story/192925/pakistan-islam-and-stability-defenders-of-the-faith-and-motherland-surprisingly-weak-on-concrete-strategy/

Mr. Ahmad has repudiated terrorist violence and is deeply remorseful for his conduct. In his letter to this Court, Mr. Ahmad states he has, "always condemned incidents like 9/11 and Time Square in my chat. I am against all kinds of terrorist actions...." Letter from Jubair Ahmad dated April 6, 2012 (Attachment A). While at the time he did not realize the severity of his actions, he fully admits he violated American law. *Id.*

## LAW AND ARGUMENT

A sentence of 24 months is sufficient but not greater than necessary to comply with the requirements of 18 U.S.C. § 3553(a)(2) and properly considers all of the co-equal factors outlined in 18 U.S.C.§ 3553(a). The severe sentencing provisions of U.S.S.G. § 2M5.1, when combined with the terrorism enhancement found in § 3A1.4, produce draconian sentencing recommendations that are not based on past practice or empirical data and that often exceed the maximum punishments authorized by 18 U.S.C. § 2339B. Additionally, given what is now known about adolescent brain development, a variance is warranted due to Mr. Ahmad's age and developmental immaturity at the time he committed some of his conduct. The over-arching mandate of 18 U.S.C. § 3553(a), including consideration of the history and characteristics of Mr. Ahmad, the nature of this offense, and the strictures of the parsimony provision, will be satisfied by a sentence of 24 months.

Courts must consider the recommended guideline range as one of seven co-equal statutory sentencing factors enumerated in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 259-60 (2005). Those factors include: (a) the nature and circumstances of the offense, (b) the history and characteristics of the defendant, (c) the kinds of sentences available, (d) the guideline

range, (e) the need to avoid unwarranted sentencing disparities, (f) the need for restitution, and (g) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

Upon consideration of those factors, a sentencing court may find that the case falls outside the "heartland" contemplated by the guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 127 S.Ct. 2456, 2465 (2007). While the sentencing court must begin its analysis by correctly calculating the advisory sentencing range, the court is then free in light of the other statutory sentencing factors to impose an entirely different sentence. This is because, under *Rita,* a district court is free simply to disagree, based on the § 3553(a) sentencing factors, with the U.S.S.G.'s "rough approximation" of the appropriate sentence for any given case. *Id.*

The overriding principle and basic mandate of § 3553(a) requires district courts to impose a sentence "*sufficient, but not greater than necessary,*" to comply with the four purposes of sentencing set forth in § 3553(a)(2): retribution (to reflect the seriousness of the offense, to promote respect for the law, and to provide "just punishment"), deterrence, incapacitation ("to protect the public from further crimes"), and rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). The sufficient-but-not-greater-than-necessary requirement is often referred to

11

as the "parsimony provision."  This requirement is not just another factor to be considered along with the others set forth in Section 3553(a) — it sets an independent limit upon the sentence.

**A.      The lengthy sentence outlined in § 2M5.1 and enhanced by § 3A1.4 is not supported by empirical data and does not reflect sound policy.**

When the Sentencing Commission fails to fulfill "its characteristic institutional role" of developing a particular guideline, or its later amendments, based upon empirical data, national experience, or some rational policy basis, the district court has the discretion to conclude that the resulting advisory range "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case." *United States v. Kimbrough*, 128 S. Ct. 558, 575 (2007); *Spears v. United States*, 129 S. Ct. 840, 843 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on *policy disagreement* with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

Sentencing Guidelines are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices.  *Rita v. United States*, 551 U.S. 338, 349 (2007).  However, the Commission did not use this empirical approach in formulating the Guideline for providing material support for a designated foreign terrorist organization.  Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 3A1.4, and later § 2M5.3, several times since their introduction in 1987, each time recommending broader application and harsher penalties.  U.S.S.G., App. C, Amend. 526 (Nov. 1, 1995); U.S.S.G., App. C, Amend. 539 (Nov. 1, 1996); U.S.S.G., App. C, Amend. 565 (Nov. 1, 1997); U.S.S.G., App. C, Amend. 637 (Nov. 1, 2002).

12

In 1994, Congress directed the Sentencing Commission to create an enhancement for prison sentences resulting from felonies involving international terrorism. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004 (to be codified at 28 U.S.C. 994 (2006). Congress directed that the enhancement apply to crimes involving or intending to promote international terrorism, "unless such involvement or intent is itself an element of the crime." *Id.* In the wake of the Oklahoma City bombing, Congress directed that § 3A1.4 should apply to domestic terrorism offenses as well. Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 730 (to be codified at 28 U.S.C. 994 (2006).

Prior to the terrorist attacks of September 11, 2001, there were no base offense Guidelines for federal crimes of terrorism. U.S.S.G., App. C, Amend. 637 (Nov. 1, 2002)(noting that amendments under the USA Patriot Act modify existing Sentencing Guidelines "for a number of offenses that, prior to the enactment of the Act, were enumerated in 18 U.S.C. § 2332b(g)(5) as predicate offenses for federal crimes of terrorism but were not explicitly incorporated in the guidelines."). The Sentencing Commission created a base offense guideline for providing material support to a designated foreign terrorist organization in the wake of the attacks of September 11, 2001. *Id.* But it failed to restrict the sweeping coverage of § 3A1.4, which Congress directed be created as a stop-gap measure to enhance sentences for felony crimes, unless the crime itself related to or involved terrorism. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004 (to be codified at 28 U.S.C. 994 (2006). The failure by the Commission to restrict the coverage of § 3A1.4 produces the irrational result that the Guideline for providing material support to a terrorist organization is enhanced for terrorism itself. Needless to say, any

violation of the statute – providing material support for terrorism – by definition involves terrorism.

The combined operation of §§ 2M5.1 and 3A1.4 result in the draconian offense level of 38 in every case. When combined with § 3A1.4's requirement that every defendant also be placed in Criminal History Category VI, the lowest possible sentencing range is 292-365 months, which includes a three-point reduction for acceptance of responsibility. And yet the maximum penalty authorized by Congress for providing material support to a designated foreign terrorist organization is 180 months.

Section 3A1.4's placement of all defendants in Criminal History Category VI is not based on a study of the recidivism of those convicted of material support or any other empirical evidence that such offenders be treated as incorrigible recidivist offenders. And it was implemented despite the empirical data and research regarding first offenders such as Mr. Ahmad who would otherwise be in Criminal History Category I. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Ex. 9 (May 2004) [hereinafter *Measuring Recidivism Report*]; U.S. Sentencing Commission, *Recidivism and the "First Offender,"* at 1314 (May 2004) [hereinafter *First Offender Report*].

The only other provision in the Guidelines that automatically inflates a defendant's Criminal History category is the Career Offender Guideline in § 4B1.1, which by its own definition applies only to defendants with at least two prior felony convictions. And Courts have varied from the often harsh sentencing recommendations of that guideline under § 3553(a). In *United States v. Martin,* 520 F. 3d 87, 88-96 (1st Cir. 2008), the First Circuit Court of Appeals

affirmed a 144-month sentence in a case where the correctly-calculated sentencing guidelines

called for a sentence of 262 to 327 months under the career-offender guideline.  The district court

in *Martin* regarded the career-offender guideline as an improper basis for determining the

appropriate sentence on the facts before it, and instead imposed a variant sentence of 144 months,

near the middle of the otherwise-applicable (non-career-offender) guideline range of 130 to 162

months.  520 F.3d at 88, 98.  The court of appeals rejected the government's argument that the

district court had improperly disregarded the career-offender guideline, holding that:

> The Supreme Court's recent decision in *Kimbrough,* 128 S.Ct. at 574-75, opened
> the door for a sentencing court to deviate from the guidelines in an individual case
> even though that deviation seemingly contravenes a broad policy pronouncement of
> the Sentencing Commission.  Here the district court grounded the defendant's
> sentence in case-specific considerations, which is the accepted practice in the post-
> *Gall* world.

520 F.3d at 96; *see also United States v. Marshall*, 259 Fed.Appx. 855, 862 (7th Cir., Jan. 4, 2008)

(in light of *Kimbrough,* "we must reexamine our case law" that holds that "courts are not

authorized to find that the guidelines themselves, or the statutes on which they are based, are

unreasonable.")

Together, §§ 2M5.1 and 3A1.4, provide that all defendants convicted of providing material

support to a designated foreign terrorist organization receive the maximum punishment authorized

by 18 U.S.C. § 2339B regardless of distinctions between various defendants' material support, the

intent with which they gave support, the organization to which the support was given, the quality

and quantum of the support, the duration of the support, the identifiable harm caused by the

support, and any identifiable victims of the support.  All of this is done without any empirical or

15

reasoned basis.  Accordingly, the resulting Guideline ranges should be given little weight in this Court's § 3553(a) analysis.

**B.**     **An additional variance is warranted where the Supreme Court announced the speech at issue in this case could be proscribed just three months before Mr. Ahmad made the video, where much of the speech cited by the government in its brief remains protected speech, and where Mr. Ahmad created portions of the video independently of LeT.**

It is well settled that the First Amendment, "do[es] not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1968).  At issue in *Brandenburg* were televised calls to violence against African Americans and jews by armed members of the Klu Klux Klan.  In *Scales v. United States*, 367 U.S. 203 (1961), the Court held Congress could not punish mere membership in the Communist Party absent proof that an individual specifically intended to further the party's unlawful ends.  These two cases form the linchpin of the First Amendment's protection of political expression.

In *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010), announced Congress could proscribe certain categories of speech pursuant to 18 U.S.C. § 2339B, where the advocacy was provided to or in coordination with a designated group, where the government's interest was to further national security and foreign relations, and where the law regulated only speech addressed to or expressed in coordination with foreign organizations and not domestic groups. *Humanitarian Law Project*, 130 S. Ct. at 2726, 2727, and 2731.  The statute is, "carefully drawn to

cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Humanitarian Law Project*, at 2723.

After *Humanitarian Law Project*, it remains lawful for a person to produce a video identical to that produced by Mr. Ahmad in this case. A person may also, in general terms, advocate jihad and martyrdom. *Brandenburg*, 395 U.S. at 447; *Cohen v. California*, 403 U.S. 15, 25 (1971)("one man's vulgarity is another's lyric.") Mr. Ahmad's provision of publicly available information to a Seton Hall student, without coordination or direction from LeT, may arguably not be proscribed. "[P]laintiff's speech is not barred if it imparts only general or unspecialized knowledge." *Humanitarian Law Project*, at 2724. A person may even join a foreign terrorist organization such as LeT, something Mr. Ahmad never did. "The statute does no prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group...." *Humanitarian Law Project*, at 2730 (citations omitted).

What made Mr. Ahmad's actions criminal was his coordination with Talha Saeed. *Humanitarian Law Project*, at 2723. But, as noted in the PSR, Mr. Ahmad ignored some of Mr. Saeed's suggestions and made some portions of the video independently of him. PSR at ¶ at 14. This results in the bizarre situation where some portions of the video are protected speech and other portions of the same video are criminally sanctionable. Additionally, *Humanitarian Law Project* would permit Mr. Ahmad to coordinate his speech with a domestic terrorist organization such as the Klu Klux Klan to promote, in general terms, the killing of Americans inside the United States, but he could not coordinate speech with a designated foreign terrorist organization in Pakistan targeting the Indian army in Kashmir. *Humanitarian Law Project*, at 2727-28.

17

The fissures in the First Amendment's freedoms of association and speech are not offered as an excuse for Mr. Ahmad's criminal conduct. But they are offered as mitigation for a man who was raised to adulthood watching JUD operate openly and legally in Pakistan and who has little background in American culture much less the evolution of American constitutional law.

**C.      Pursuant to § 3553(a) this Court should impose a sentence of 24 months in this case.**

### 1. Nature and Circumstances of the Offense and the History and Characteristics of Mr. Ahmad.

The government focuses much of its position paper on Mr. Ahmad's attendance at two three-week training courses when he was 14 and 15. Government Position at ¶ 15-18. Mr. Ahmad's youth and immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies of the brain conclude that its development may not be complete until the age of twenty-five. *See* Elizabeth Williamson, *Brain Immaturity Could Explain Teen Crash Rate*, Wash. Post, Feb. 1, 2005 (summarizing a recent National Institutes of Health (NIH) study that suggests "that the region of the brain that inhibits risky behavior is not fully formed until age 25"). In *Roper v. Simmons*, 125 S. Ct. 1183, 1195 (2005), the Supreme Court relied on studies indicating adolescents are less culpable for their actions than adults: "[A]s any parent knows and as the scientific and sociological studies respondent and his amici cite tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' (citations omitted) It has been noted that 'adolescents are over represented statistically in virtually every category of reckless

behavior.'")(quoting Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Review 339 (1992)).

While the *Roper* Court held imposition of the death penalty is unconstitutional for those persons who committed the death-eligible crime before the age of eighteen, the recent NIH report confirms that there is no bright line deliniating at what age a person reaches full maturity. National Institute of Health Publication 4929, *The Teenage Brain: A Work In Progress* (2008). Two years later, in *Gall v. United States*, 552 U.S. 28 (2007), the Court relied on the youth of the twenty-one-year-old defendant as one of the reasons justifying a below-guidelines sentence:

> In summery, the District Judge observed that all of Gall's criminal conduct "including the present offense, occurred when he was twenty-one-years old or younger" and appeared "to stem from his addictions to drugs and alcohol." *Id.*, at 122-123.  The District Judge appended a long footnote to his discussion of Gall's immaturity.  The footnote includes an excerpt from our opinion in Roper v. Simmons, 543 U.S. 551, 569 (2005), which quotes a study stating that a lack of maturity and an undeveloped sense of responsibility are qualities that "'often result in impetuous and ill-considered actions.'" The District Judge clearly stated the relevance of these studies in the opening and closing sentences of the footnote: "Immaturity at the time of the offense conduct is not an inconsequential consideration.  Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five.  "[T]he recent [NIH] report confirms that there is no bold line demarcating at what age a person reaches full maturity.  While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant." App. 123, n 2.

*Id.* at 57-58; *See also, United States v. Stern*, 590 F. Supp. 2d 945 (E. D. Ohio 2008)(granting variance for twenty-two-year-old defendant who began viewing child pornography as an adolescent.) .

Mr. Ahmad's crime itself, while serious, is precisely the type of ill-considered action discussed in *Roper* and *Gall*.  In a post-*Booker* world, this Court certainly retains authority to fashion a non-guidelines sentence in light of the nature and circumstances of these offenses and the characteristics and history of Mr. Ahmad.  It is worth noting that despite his intolerant rhetoric on the internet, in the real world Mr. Ahmad has conducted himself as a law-abiding resident alien indistinguishable from the vast majority of the American population.

Should the Court sentence Mr. Ahmad to 24 months in prison,  Mr. Ahmad will be twenty-six-years-old upon his release.  Both the age of an offender and his/her first offender status are powerful predictors of the likelihood of recidivism. Indeed, the Sentencing Commission has itself recognized that (1) recidivism rates decline dramatically with age, and (2) first-time offenders are even less likely to re-offend than defendants with a limited criminal history who also fall within Criminal History Category I. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Ex. 9 (May 2004) [hereinafter *Measuring Recidivism Report*]; U.S. Sentencing Commission, *Recidivism and the "First Offender,"* at 1314 (May 2004) [hereinafter *First Offender Report*]. The Commission's research has, for example, demonstrated that a 20-year-old defendant in Criminal History Category I has a 29.5% chance of reoffending, while a 49-year-old defendant with the same criminal history has only a 6.9% chance of recidivating. *Measuring Recidivism Report* at Ex. 9. With respect to first offenders, the Commission has found that offenders with zero criminal history points have a recidivism rate of just 11.7%, while offenders with just one criminal history point have double the recidivism rate at 22.6%. *First Offender Report* at 13-14.

Despite these clear and compelling findings, the Commission has failed to revise the Guidelines to take either age or first-offender status into account. The Commission clearly recognized the advisability of revising the Guidelines to take these factors into account. *See First Offender Report* at 1-2 (identifying goal of refin[ing] a workable 'first-offender' concept within the guideline criminal history structure); *Measuring Recidivism Report* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines if incorporated into the criminal history computation"). But, in the six years since publishing its *Fifteen Year Report*, the Commission has taken no action toward implementing such revisions.

In response to the Commission's inaction, a growing number of courts have themselves taken both age and first-offender status into account when fashioning an appropriate sentence under 18 U.S.C. § 3553(a). *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding sentence in child pornography case as reasonable where district court granted downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 2009 WL 995576, at *3 (2d Cir. Apr. 19, 2009) (holding that "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming a below-guidelines sentence where the district court's only reason for the variance was that the defendant's age made it unlikely that he would again be involved in another violent crime); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants, like Cabrera, "with zero criminal history points are less likely to recidivate than all other offenders.");

*Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (explaining that sentence of 262 months – as opposed to Guidelines sentence of 324 to 405 months – constituted "sufficient, but not excessive, deterrence" for 44-year-old defendant); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (explaining that age of offender is relevant to § 3553(a) analysis, even if not ordinarily relevant under the Guidelines, and granting variance to 57-year-old defendant); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first – *i.e.*, the charged – act). In light of Mr. Ahmad's absence of criminal history, a similar variance is warranted in this case.

### 2. The Advisory Guidelines Range.

Mr. Ahmad concedes that the technically correct calculation of the advisory guidelines range is 180 months (total offense level 35 at Criminal History Category VI). In considering the advisory Guidelines range as one of the seven co-equal factors, however, the Court should first depart from the restricted range of 180 months to a lower advisory guidelines range for the reasons stated above and below. While the guidelines range must be considered as one of the co-equal factors, the Supreme Court held recently that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009)(emphasis in original).

Were Mr. Ahmad's material support for terrorism offense not subject to the terrorism enhancement as discussed above, the adjusted offense level for Count 1 would be 26. After

applying a three-point reduction for acceptance of responsibility, the adjusted offense level would be 23, resulting in an advisory guidelines-range of 92-115 months (total offense level 23 at Criminal History Category VI).  Were Mr. Ahmad placed in Criminal History Category I, where he would be absent the Criminal-History enhancement found in 3A1.4, the advisory guidelines range would be 46-57 months.  In light of the parsimony provision of § 3553, a sentence to 24 months is appropriate in this case.

Finally, the combined operation of §§ 2M5.1 and 3A1.4 place nearly every § 2339B case in the advisory guidelines range of 360 months to life, which is twice the statutory maximum punishment of fifteen years.  This occurs even though Congress has established no mandatory minimum sentence for this offense, and has thus authorized a wide range of punishments from probation to fifteen years imprisonment.  The operation of the guidelines in this case is wholly unreasonable, and this Court should impose a sentence of 24 months.

3. **The Need to Promote Respect for the Law, to Provide Just Punishment and Deterrence and to Prevent Unwarranted Sentencing Disparities.**

For the reasons discussed above, a sentence of 24 months in Mr. Ahmad's case would promote respect for the law, provide just punishment and deterrence, and prevent unwarranted sentencing disparities.  Between 2001 and July 2007, a total of 108 defendants were charged with at least one count of violating 18 U.S.C. § 2339B.  Robert M. Chesney, Federal Prosecution of Terrorism-Related Offenses: Convictions and Sentencing Data in Light of the "Soft-Sentence" and "Data-Reliability" Critiques, 11 Lewis & Clark L. Rev. 851, 885 (2007).  Of the thirty defendants convicted and sentenced under § 2339B, seven were convicted by jury trial, and twenty-three were

convicted following a plea agreement. *Id.* The mode sentence was 180 months, and the median

sentence was 120 months. *Id.* The average sentence was 122.73 months. *Id.* For cases involving

a guilty plea, the mean was 107.91 months, the median 96 months, and the mode 180 months. The

table below is a representative sample of cases during and after the 2001 to 2007 time period

analyzed in Professor Chesney's study.

| | NAME | CHARGES *All U.S.C. sections are Title 18 unless otherwise noted.* | FACTS | SENTENCE |
|---|---|---|---|---|
| 1 | FARIS, Iyman (EDVA 2003) | § 2339B (2 counts); § 371 (Guilty Plea) | Participated in plan with al Qaeda to carry out a terrorist attack in New York City by cutting bridge's cables. Attempted to obtain equipment for plot. | 240 months |
| 2 | AL-KASSAR, Monzer (SDNY 2009) | § 2339B(a)(1); § 2332(b); § 1114 and 1117; § 2332(g)(a)(1); § 1956(a)(3) (Jury Trial) | Agreed to sell 15 surface-to-air missiles, 4,000 grenades, nearly 9,000 assault rifles, and thousands of pounds of explosives to Revolutionary Armed Forces of Colombia. | 360 months |
| 3 | AL-GHAZI, Tareq Mousa (SDNY 2009) | § 2339B; § 1114, 1117, 3238 § 2332g(a)(1), (b)(4), 3238 (Jury Trial) | Associate of Al-Kassar, agreed to sell weapons to terrorists of Revolutionary Armed Forces of Colombia. | 300 months |
| 4 | AREF, Yassin Muhiddin (NDNY 2007) | §2339B; § 1956(a)(3) and (h); § 2339A; § 1546 (Jury Trial) | Plotted to import surface-to-air missiles with the belief that they would be used to attack the Pakistani ambassador in New York City. | 180 months |
| 5 | HOSSAIN, Mohammed Mosharref (NDNY 2007) | § 2339B; § 2339A; § 1956 (Jury Trial) | Associate of Yassin Aref; plotted to import weapons for an attack on Pakistani ambassador. | 180 months |
| 6 | SABIR, | § 2339B (2 counts) | Pledged 'bayat' to Usama Bin Laden and conspired to | 300 months |

| | | | | |
|---|---|---|---|---|
| | Rafiq (SDNY 2007) | (Jury Trial) | provide martial arts training and medical assistance to al Qaeda through a man he believed to be a terrorist. | |
| 7 | PARACHA, Uzair (SDNY 2006) | § 2339B (2 counts); 50 U.S.C. § 1705(b) (2 counts); § 1028A (Jury Trial) | Attempted to help al Qadea member Majid Kahn enter the U.S. to commit a terrorist acts of attacking gas stations. Posed as Kahn when dealing with authorities in U.S. so Kahn could go undetected. | 360 months |
| 8 | ALI, Ahmed Omar Abu (EDVA 2009) | § 2339B; § 2339A; § 1751(d); 50 U.S.C. § 1705(b); 49 U.S.C. § 46502 (Jury Trial) | Plotted with al Qaeda to kill President George W. Bush and other September 11-type attackes and assassinations. | Life |
| 9 | GRECULA, Ronald Allan (SDTX 2007) | § 2339B (Guilty Plea) | Attempted to build and sell explosive device to al-Qaeda. | 60 months |
| 10 | REYNOLDS, Michael Curtis (MDPA 2007) | § 2339B; § 2339A; § 373; § 824(p)(2); 26 U.S.C. § 5841, 5861(d), 5871 (Jury Trial) | Posted solicitations to engage in terrorist activity, specifically bombing U.S. oil pipelines. Admitted to being in contact with al-Qaeda. Had explosives and illustrative operational plans at his home. | 360 months |
| 11 | KASSIR, Oussama (SDNY 2006) | § 2339B (4 counts); § 2339A (2 counts); § 2339A(a); § 956(a); § 842(p)(2)(A); § 371 (Jury Trial) | Established jihad training camp in Oregon. Trained jihadists in use of guns and knives in preparation to fight jihad against the United States in Afghanistan. | Life |
| 12 | WARSAME, Mohamed Abdullah (DMN 2009) | § 2339B (Guilty Plea) | Traveled to Afghanistan to train with Al Qaeda where he attended lectures by Usama Bin Laden. Served as al Qaeda as security guard and taught English to Al Qaeda associates. *Cooperated with Government.* | 92 months |
| 13 | AL-BAKRI, Muhktar (WDNY | § 2339A (Guilty Plea) | Member of "Lackawanna Six" terrorist "sleeper cell." Received training in the use of firearms and explosives at Al Qaeda's al Farooq training camp. | 120 months |

25

| | | | |
|---|---|---|---|
| | 2003) | | *Cooperated with Government.* | |
| 14 | GOBA, Yahya (WDNY 2003) | § 2339B (Guilty Plea) | Member of "Lackawanna Six" terrorist "sleeper cell." Traveled with al-Bakri and others to al Qaeda's al-Farooq training camp in Afghanistan where he received weapons and explosives training. *Plea agreement required cooperation.* | 120 months |
| 15 | ALWAN, Sahim (WDNY 2003) | § 1029B (Guilty Plea) | Member of "Lackawanna Six" terrorist "sleeper cell." Traveled to Afghanistan to attend al-Qaeda's camp al-Farooq where he listened to Usama Bin Laden's lectures and learned how to assemble and use firearms. | 114 months |
| 16 | MOSED, Shafel (WDNY 2003) | § 2339B (2 counts) (Guilty Plea) | Member of "Lackawanna Six" terrorist "sleeper cell." Trained at camp al-Farooq. | 96 months |
| 17 | TAHER, Yasein (WDNY 2003) | § 2339B (2 counts) (Guilty Plea) | Member of "Lackawanna Six" terrorist "sleeper cell." | 96 months |
| 18 | AL-MARRI, Ali Saleh Kalah (CDIL 2009) | § 2339B (Guilty Plea) | Attended terrorist training camps from 1998 to 2001. At order of Khalid Shaikh Mohammed, entered the United States on Sept. 10, 2001, to await instructions. Held as enemy combatant for more than eight years. | 100 months |
| 19 | IQBAL, Javed (SDNY 2009) | § 2339B and 2 (Guilty Plea) | Provided satellite transmission services to al-Manar, a Hizabllah operated television station. | 69 months |
| 20 | ELAHWAL, Saleh (SDNY 2009) | § 2339B and 2 (Guilty Plea) | Associate of Javed Iqbal. | 17 months |
| 21 | AL-TIMIMI, Ali (EDVA 2005) | 50 U.S.C. § 1705; § 371; § 924(c)&A; § 844(h); § 2384; § 373 (Jury Trial) | Convicted of urging followers to travel to Afghanistan to wage violent jihad against Americans. Some actually traveled overseas in effort to wage war against the U.S. | Life |
| 22 | KAHN, Masoud | § 371; § 2339A; | Member of the "Virginia Jihad Network," used paintball guns to train for holy war around the globe. | Life |

| | | | | |
|---|---|---|---|---|
| | (EDVA 2005) | § 924(c)&(o); §2384; 50 U.S.C. § 1705 (Bench Trial) | After September 11, traveled to Pakistan to train with Lashkar-e-Taiba in hopes of joining the Taliban in war against the United States. | |
| 23 | CHAPMAN, Seifullah (EDVA 2005) | § 371; § 2339A; § 924(o) (Bench Trial) | Member of the "Virginia Jihad Network," used paintball guns to train for holy war around the globe. Trained with Lashkar-e-Taiba in hopes of joining the Taliban in war against the United States. | 780 months |
| 24 | CHANDIA, Ali Asad (EDVA 2008) | § 2339B (2 counts); § 2339A (Jury Trial) | Provided material support to Lashkar-e-Taiba by helping leader Masoud Kahn in Virginia. Delivered paintballs for shipment to Pakistan. Visited Lashkar-e-Taiba offices in Pakistan. *Sentence vacated by 4th Circuit because of improper terrorism enhancement application, scheduled for re-sentencing in March.* | 180 months |
| 25 | ROYER, Randall Todd (EDVA 2004) | § 924(c); § 884 (Guilty Plea) | Member of the "Virginia Jihad Network," used paintball guns to train for holy war. Admitted to helping Kahn and others join the Lashkar-e-Taiba trianing camp. | 240 months |
| 26 | AATIQUE, Muhammad (EDVA 2003) | §924(c); § 960 (Guilty Plea) | Member of the "Virginia Jihad Network," used paintball guns to train for holy war. Traveled to Pakistan and trained for jihad with Lashkar-e-Taiba. *Cooperated with Government.* | 38 months |
| 27 | KWON, Yong Ki (EDVA 2003) | § 371; § 924(c) and (h) (Guilty Plea) | Member of the "Virginia Jihad Network," used paintball guns to train for holy war. Traveled to Pakistan and trained for jihad with Lashkar-e-Taiba. *Cooperated with Government.* | 38 months |
| 28 | SADEQUEE, Ehsanul Islam (NDGA 2009) | § 2339B(a)(1) (2 counts); § 2339A(a) (2 counts) (Jury Trial) | Took photographs and videos in Washington, D.C. for use in jihad planning and sent videos to al Qadea and Lashkar-e-Taiba contacts. Traveled to Bangladesh and formed violent jihadist organization known as "Al Qaeda in Northern Europe." | 204 months |
| 29 | HASAN, Khwaja Mahmood (EDVA | § 371; § 924 (Guilty Plea) | Member of the "Virginia Jihad Network," used paintball guns to train for holy war. Traveled to Pakistan and trained for jihad with Lashkar-e-Taiba. | 45 months |

| | | | | |
|---|---|---|---|---|
| | 2003) | | *Cooperated with Government.* | |
| 30 | BRENT, Mahmud Faruq (SDNY 2007) | § 2339B (Guilty Plea) | Traveled to Pakistan and attended Lashkar-e-Taiba training camp. | 180 months |
| 31 | RESSAM, Ahmed (WDWA 2008) | §2332b(a)(1); § 844(h)(2); § 33 and 2; § 1028(a)(4) and (b)(3)(B); §1546; (Jury Trial) | Plotted to carry out an attack on the U.S. by detonating explosives at Los Angeles International Airport. The plot was to be paid for by proceeds from bank robberies, which Ressam also helped plan. Ressam had attended training camps in Afghanistan before coming to the U.S. | 264 months |
| 32 | HAMDAN, Salim (Military Commission 2008) | 10 U.S.C. § 950v(B)(25) (Military Commission) | Usama Bin Laden's "driver," Hamdan worked for Bin Laden personally for many years. Held as enemy combatant for five years. | 66 months |
| 33 | HICKS, David (Military Commission 2007) | 10 U.S.C. § 950v(B)(25) (Guilty Plea) | Attended al Qaeda training camps in Afghanistan and conducted surveillance on British and American embassies. Held as enemy combatant for six years. | 84 months |
| 34 | KHADR, Omar (Military Commission 2010) | 10 U.S.C. § 950v(B)(25) (Guilty Plea) | Threw a grenade that killed American sergeant Christopher Speer in Afghanistan. Converted landmines into Improvised Explosive Devices and planted IED's with the intent to kill American forces. Held as enemy combatant for nine years. | 96 months |
| 35 | LINDH, John Walker (EDVA 2002) | 50 U.S.C. § 1705; 18 U.S.C. § 844 (Guilty Plea) | Soldier in the Taliban in Afghanistan. Trained with al Qaeda at camp al-Farooq where he learned how to use guns, explosives, maps and learned battlefield training. | 240 months |
| 36 | MALDONADO, Daniel Joseph (EDTX 2007) | § 2339D (Guilty Plea) | Traveled to Somalia to join the Islamic Courts Union (ICU) and al Qaeda to fight jihad against the Transitional Federal Government in Somalia. | 120 months |
| 37 | GEELE, Mohamed | Convicted of breaking into the | Broke into the home of Danish political cartoonist Kurt Westergaard, who had portrayed the Prophet Mohammad | 108 months |

| | | | |
|---|---|---|---|
| (Denmark 2011) | home of Danish cartoonist with the intent to harm (Jury Trial) | with a turban shaped like a bomb. | |

While the average sentence in cases where a defendant pleads guilty to at least one count of § 2339B is 107.91 months, a sentence to 24 months in this case, which involves providing material support to a foreign terrorist organization over the internet and without actual violence, will be more than sufficient to promote respect for the law and avoid unwarranted sentencing disparities. *See e.g., United States v. Warsame*, 651 F. Supp. 2d 978 (D. Minn.2009)(Comparing federal and military commission cases before imposing 92 month sentence).

The government argues Mr. Ahmad, "was at the center of LeT's efforts to disseminate propaganda, attract new recruits, and raise funds online." Government Position at 18. This is difficult to believe given LeT operates a professional media organization that operates a radio station, websites in four languages, and distributes hundreds of thousands of newspapers and magazines. STEPHEN TANKEL, STORMING THE WORLD STAGE, THE STORY OF LASHKAR-E-TAIBA 80-81 (2011). The government also argues, "there is no way to know who may have downloaded [the video] in order to use it as a recruiting tool." Government Position at 19. While this speculation may be true, there is equally no way to know if it was ever downloaded or if it remains available at all. And while Mr. Ahmad does not dispute that terror organizations have used internet sites such as YouTube to disseminate propaganda, there is no evidence before this Court indicating Mr. Ahmad's video was widely disseminated. In fact, YouTube, which uploaded 13 million hours of video in 2010, at a rate of over 35 hours per minute, ranks videos with high play

29

counts.[4]   While the number of "views" of Mr. Ahmad's video remains unknown, it is known that it was not among YouTube's most popular videos in 2010.  These included an Old Spice commercial, a giant double rainbow, and an elementary school talent show.[5]

This Court should also consider that many of the individuals in the table above were convicted of providing material support to al Qaeda, which is responsible for horrific attacks on the United States and its interests and citizens abroad.  *See e.g.,* Hamdan, Khadr, Hicks, Sadequee, Ressam, Al-Marri, Mosed, Taher, Alwan, Goba, Al-Bakri, Warsame, Reynolds, Grecula, Ali, Paracha, Sabir, and Faris.  By contrast, LeT has never conducted terrorist operations exclusively targeting Americans at home or abroad.  Just as there are disparities in culpability between those who provide material support for terrorist organizations and those who conduct violent terrorist attacks, so too are there disparities in the culpability of the forty-seven foreign terrorist organizations on the State Department's List of Designated Foreign Terrorist Organizations.

The defendants convicted of providing material support to LeT in the table above received sentences between 38 months and life, with many of those defendants receiving sentences from this Court.  Two of the defendants who received 38 months actually traveled to Pakistan as adults and received advanced military training aimed a waging violent jihad.  By contrast, Mr. Ahmad's criminal conduct occurred exclusively online, and during two days in September and October 2010.  A year in prison for each day he spent coordinating and producing the video in this case is a harsh penalty and adequately addresses the seriousness of his conduct.

---

[4]http://www.huffingtonpost.com/2010/12/13/top-youtube-videos-2010_n_795753.html#s20 5561&title=10__Ken
[5]http://abcnews.go.com/GMA/top-youtube-videos-2010/story?id=12379343

Section 3553(a) also requires this Court to assess the need to protect the public and to deter defendant's like Mr. Ahmad from future criminal conduct. *United States v. Ressam,* 2010 U.S. App. LEXIS 25583 (9th Cir. 2010)("This factor is particularly relevant in a terrorist case such as this, where Ressam, who has demonstrated strongly held beliefs about the need to attack American interests in the United States and abroad, will by only 53 years old upon his release."). But unlike cases involving charges of actual or attempted acts of violence, such as *Ressam*, a person may be convicted under § 2339B if he has merely attempted to provide something of value to a designated terrorist organization, even if there is no connection shown between the support provided and terrorism, and no intent to further terrorist activity. *Warsame*, 651 F. Supp. 2d at 983 ("In sum, while Warsame has not been directly involved in the types of catastrophic plots have garnered worldwide headlines, and does not merit the type of sentence appropriate for those involved in such plots, he provided material support to [al Qaeda] that has those sights in mind."); David Cole, Out of the Shadows: Preventative Detention, Suspected Terrorists, and War, 97 Calif. L. Rev. 693 (2009). Thus, while this Court should address these sentencing factors under the parsimony provision, it need not give the weight sought by the government or some courts in cases involving charges of attempted and actual violent acts.

There is also is a lessened need to protect the public given Mr. Ahmad's expected deportation to Pakistan. *United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728, 733 (E.D. Va. 2005) (noting the decreased need to protect the public from further crimes of the defendant when he "will ultimately be removed and sent out of the country"); *United States v. Biheiri*, 356 F. Supp. 2d 589, 603 (E.D. Va. 2005) (observing that the goal of protecting the public was "of little import"

where the defendant was going to be deported to Egypt immediately following his release from custody).

Another critical distinction between Mr. Ahmad and others convicted of similar crimes is that, unlike *Ressam* and others, Mr. Ahmad has categorically rejected terrorism and cooperated with the government's investigation. Indeed, after being informed that the video was criminal, Mr. Ahmad immediately took it down from the website, YouTube. PSR at ¶ 17. Unlike Mr. Ahmad, who has renounced violence and is determined to assist the government to the best of his ability, Ahmed Ressam told the judge in his case, "Sentence me to life in prison or anything you wish. I will have no objection to your sentence." *Ressam*, 2010 Lexis at *38. He realizes he has forfeited the opportunity to live in this country with other members of his family, and is determined to right his past wrongs before being deported.

Mr. Ahmad is 24 years old and should be in Criminal History Category I. The Sentencing Commission has recognized that an offender within this Criminal History Category is extremely unlikely to recidivate. Given Mr. Ahmad's extraordinarily low risk of recidivism, a within-guidelines sentence–the statutory maximum punishment--is simply greater than necessary to protect the public from the small chance of his committing future crimes. Such a lengthy sentence would only serve to provide retribution at a very high cost to the American taxpayer. Moreover, because it is the certainty, not the severity, of punishment that best serves as a general deterrent to the public at large, a sentence substantially below the advisory range would more than adequately fulfill § 3553(a)(2)(B)'s goal of "afford[ing] adequate deterrence to criminal conduct." In terms of deterrence, a sentence of 24 months will deter Mr. Ahmad from committing further crimes.

## CONCLUSION

In light of the factors outlined by § 3553(a), including the nature and circumstances of the offense and the character of Mr. Ahmad, his decision to plead guilty and his acceptance of responsibility, he respectfully requests that this Court sentence him to 24 months.

Respectfully submitted,
Jubair Ahmad
By Counsel:

_____/s/_____
Brian L. Mizer
Assistant Federal Public Defender
Virginia Bar Number 79384
Counsel for Mr. Ahmad
1650 King St., Suite 500
Alexandria, Virginia 22314
(703) 600-0840 (tel.)
(703) 600-0880 (fax)
Brian_Mizer@fd.org

## EXHIBITS

A)  Letter from Jubair Ahmad dated April 6, 2012.
B)  Letters from co-workers and associates of Mr. Ahmad.
C)  *The Economist,* The World's Most Dangerous Border, May 19, 2011.
D)  The Economist, *Murder Most Common,* July 29, 2010.
E)  India Today, *Samihauta blasts: NIA chargesheets Aseemanand, 4 others*, June 21, 2011

33

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of April 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Mr. Neil Hammerstrom, Esquire
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Ave.
Alexandria, Virginia, 22314
Tel: 703.299.3700

_____/s/_____

 Brian L. Mizer
Assistant Federal Public Defender
Virginia Bar Number 79384
Counsel for Mr. Ahmad
1650 King St., Suite 500
Alexandria, Virginia 22314
(703) 600-0840 (tel.)
(703) 600-0880 (fax)