**In the United States District Court for the Eastern District of Virginia Alexandria Division**

**United States of America,**

**v.**                                                        **Docket No. 1:11-cr-00554-**
                                                               **The Hon. T.S. Ellis III**

**Jubair Ahmad.**

### Defendant's Motion for Sentence Reduction
### Under § 603(b) of the First Step Act and 18 U.S.C § 3852(c)

Jubair Ahmad, through undersigned Counsel, respectfully moves this Court

for Sentence Reduction under § 603(b) of the First Step Act and 18 U.S.C §

3852(c)(1)(A).

Mr. Ahmad's request relies on a combination of circumstances amounting to

extraordinary and compelling reasons for his release: 1) the conditions of his

confinement – regular COVID-19 lockdowns and the last four years at an

administrative facility without direct sunlight; and 2) his record of rehabilitation in

custody.  Mr. Ahmad has served 92% of his sentence; if he were halfway-house

eligible, he would have served 96% of his sentence.

In Mr. Ahmad's 112 months of incarceration, he has taken every advantage of

BOP programming. He is currently scheduled to be released on November 21, 2021,

at which point he will be transferred to Immigration and Customs Enforcement

custody and eventually deported to Pakistan.  Mr. Ahmad asks the Court to

consider resentencing him to time served under Section 603 of the First Step Act

such that he be immediately transferred to ICE custody and deported to Pakistan.

1

I.      Factual Background and Procedural Posture

On December 2, 2011, Mr. Ahmad pleaded guilty to a one-count information for providing material support to foreign terrorist organization. Doc. 41.  On September 25, 2010, Mr. Ahmad produced a video encouraging the support of jihad and the mujahedeen for Lashkar-e-Tayyib, which had been designated a terrorist organization by the U.S. Department of State. Doc. 43. This Court sentenced him to 144 months' incarceration. Doc. 52.

II.     Mr. Ahmad has complied with the requirements of the First Step
        Act and there is no procedural barrier to granting his release.

Section 3582(c)(1)(A) of Title 18 provides that a court may grant compassionate release after an inmate has exhausted administrative remedies, or "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier.*"   First Step Act §603(b) (emphasis added). Congress selected this exceptionally short 30-day waiting period in order to expedite defendants' access to the courts and the courts' consideration of compassionate release motions. Courts in

2

this district[1] and throughout the country[2] have found that the exhaustion requirement is satisfied upon the passage of thirty days after a prisoner's request for compassionate release, regardless of whether the BOP issues a denial of the request in the meantime. The only Circuit Courts to consider the issue have agreed[3] — including the Fourth Circuit, which recently concluded that the "'30-day lapse' alternative" permits petitioners to "proceed directly to district court if his request is not acted on within that time." *United States v. McCoy*, 981 F.3d 271, 283 (4th Cir. 2020).

Likewise, it is the official position of the Department of Justice and the Bureau of Prisons that a defendant can file a motion for compassionate release in district court 30 days after requesting relief from the Warden, even if the Warden denies the

---

[1] *See, e.g., United States v. Wilson*, Case No. 2:11cr180, Doc. No. 663, at 4-5 (E.D. Va. May 29, 2020) (J. Jackson) (finding exhaustion satisfied where defendant submitted request for compassionate release to the warden on March 27, 2020, which was subsequently denied on April 10, 2020, within the 30 days of the request); *United States v. Latney*, Case No. 1:19cr202. Doc. No. 36, at 4, n.4 (E.D. Va. June 2, 2020) (J. Trenga); *United States v. Robinson*, Case No. 3:10cr261, Doc. No. 86, at 8 (E.D. Va. July 17, 2020) (J. Lauck); *United States v. Geister*, Case No. 2:10cr127, Doc. No. 52, at 3-4 (E.D. Va. Aug. 14, 2020) (J. Allen); *United States v. Ray*, Case No. 1:18cr177, Doc. No. 33, at 1 (E.D. Va. Aug. 17, 2020) (J. Brinkema).

[2] *See, e.g.,United States v. Fields*, No. 3:12-cr-00022, Doc. No. 223 (D. Alaska May 6, 2020) ("Numerous courts have found that a defendant satisfies the exhaustion requirement simply by making a formal initial request and allowing thirty days to elapse prior to filing suit, even where the warden denies the request within thirty days."); *United States v. Amarrah*, 2020 WL 2220008, at *4 (May 7, 2020); *United States v. Haney*, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) ("Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of the facility before filing a motion.").

[3] *See United States v. Harris*, 2020 WL 5198870 (3d Cir. 2020) (accepting government's concession of error and vacating district court order requiring full exhaustion where warden's denial came within 30 days); *United States v. Alam*, 960 F.3d 831 (6th Cir. 2020).

relief within 30 days.[4] The government has conceded this point multiple times in this district.[5]

The language of the compassionate release statute and the Program Statement issued by the BOP itself also support this interpretation.[6]  Accordingly, Mr. Ahmad has satisfied the exhaustion requirement contained in 18 U.S.C. § 3582(c) by submitting his request over 30 days ago and his motion is ripe for review.

Mr. Ahmad submitted a request for compassionate release to the FCI SeaTac warden on July 13, 2020; he received a denial three days later. *See* Exhibit 1, Compassionate Release Request and Denial.

III.    <u>Congress passed the First Step Act to expand sentence reductions.</u>

---

[4] *See, e.g.*, *United States v. Harris*, 20-1723, Government Brief (3d Cir. June 9, 2020) (asking Court of Appeals to reverse and remand because the district judge had adopted incorrect position on exhaustion.).

[5] *See, e.g.*, *United States v. Kimbrough*, No. 3:09cr220, Response of the United States to Defendant's Briefing on Exhaustion, Doc. No. 82 at 3 (E.D. Va. Sept. 8, 2020) ("[T]he United States agrees with the defendant that the exhaustion requirement is satisfied upon the passage of thirty days since a prisoner's request for compassionate release, regardless of whether the BOP issues a denial of the request in the meantime.") (internal quotation marks omitted); *United States v. Smith*, No. 2:18cr96, United States' Response Opposing Defendant's Motion for Compassionate Release, Doc. No. 37 at 12, n.5 (E.D. Va. Apr. 17, 2020) (conceding that "if the BOP rejects the request or takes no action within the 30 day window, the inmate is then free to press his position in the appropriate federal court").

[6] *See* 18 U.S.C. 3582(c)(1)(A) (A petitioner may bring a motion to modify his sentence "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier*.") (emphasis added); U.S. Dept. of Justice, Fed. Bur. of Prisons, Program Statement 5050.50 (Jan. 19, 2020) ("Under 18 U.S.C. § 3582(c)(1), an inmate may file a request for a reduction in sentence with the sentencing court after receiving a BP-11 response under subparagraph (a), the denial from the General Counsel under subparagraph (d), *or the lapse of 30 days from the receipt of such a request by the Warden of the inmate's facility, whichever is earlier.*") (emphasis added).

Prior to passage of the First Step Act, the Office of the Inspector General concluded that the Bureau of Prisons "does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."[7]

Congress heard those complaints and responded to them by passing the First Step Act on a bipartisan basis in late 2018. Part of the new law transformed the process for compassionate release under § 3582(c)(1)(A) by changing the process by which reductions in sentence occur.[8] The effect of these changes is to grant federal judges the ability to move on a prisoner's reduction in sentence application even in the face of BOP opposition or its failure to respond to a prisoner's request for a reduction in sentence in a timely manner. Congress made these changes to expand the use of sentence reductions under § 3582(c)(1)(A). To begin with, Congress labeled these changes, "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018).

After Congress passed the First Step Act, petitioners may file directly to the Court for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). The statute lists potential bases for granting such a sentence reduction, including "extraordinary and compelling reasons"; it also requires any such grant to be consistent with "applicable policy statements" by the Sentencing Commission. While the Sentencing

---

[7] [5] Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration*, 21 FED. SENT. RPTR. 167 (Feb. 2009).

[8] P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018).

Commission's policy statements determine how Courts may execute the action, the Fourth Circuit has found that there are no applicable policy statements to inmates' filing compassionate release motions directly with the courts. *McCoy*, 981 F.3d at 281.

Moreover, the Court held that "[b]y creating an avenue for defendants to seek relief directly from the courts, Congress was expanding the "discretion [of the courts] to consider leniency." McCoy, 981 F.3d at 276 (citing *United States v. Zullo*, 976 F.3d 228, 230 (2d. Cir. 2020)) (emphasis added).

IV.    The 3553(a) factors indicate that Mr. Ahmad deserves punishment – and 112 months is sufficient.

When deciding whether to grant a motion for compassionate release, the court must consider the factors set forth in 18 U.S.C. § 3553(a), including "the history and characteristics of the defendant" and whether the sentence imposed was "sufficient, but not greater than necessary" to afford deterrence and protect the public.[9]

In 2011, Mr. Ahmad appeared before this Court with no criminal history – however, enhancements in the Sentencing Guidelines resulted in a criminal history Category VI. His subsequent record while incarcerated confirms that his crime of conviction in this case was an aberration rather a foreshadowing.

The Supreme Court has endorsed the notion that "[i]n assessing . . . deterrence, protection of the public and rehabilitation . . . there would seem to be no better evidence than a defendant's post-incarceration conduct." *Pepper v. United*

---

[9] 18 U.S.C. § 3553(a)(1) and (2).

*States*, 562 U.S. 476, 491 (2011) (internal citations and quotations omitted). In his nine years in custody, Mr. Ahmad has completed more than two dozen BOP programs:

```
·-------------------- EDUCATION COURSES  -------------·
     DESCRIPTION                         START DATE   STOP DATE
     FAIR INFORMATION                    12-10-2018 06-17-2019
     HEALTH FAIR                         07-15-2018 08-08-2018
     CROCHETT CLASS                      02-11-2018 04-02-2018
     HLTH&NUTRITN SELF STDY 20HR(1) 10-12-2017 11-09-2017
     BASIC ADOMINAL WELLNESS WRKOUT 06-12-2017 08-06-2017
     AIDS AWARENESS RPP (C1)             05-18-2017 05-18-2017
     (A)WINDOWS VISTA 2-CAI              08-01-2016 08-23-2016
     (A)WINDOWS VISTA 1-CAI              07-01-2016 08-01-2016
     (L) SPANISH TRAVEL 2                07-01-2016 07-27-2016
     (L)SPANISH TRAVEL 1                 05-04-2016 05-27-2016
     (L)SPANISH PERSONAL 2               05-11-2016 05-11-2016
     (L) SPANISH PERSONAL1               04-04-2016 04-27-2016
     (L)SPANISH BUSINESS 2               04-01-2016 04-21-2016
     (L) SPANISH BUSINESS 1              04-01-2016 04-12-2016
     (L)SPANISH 2-CAI                    03-01-2016 03-30-2016
     (L)SPANISH 1-CAI                    02-20-2016 03-09-2016
     (A)MSO EXCEL 2-CAI                  11-18-2015 12-08-2015
     (A)MSO EXCEL 1-CAI                  11-18-2015 12-08-2015
     (A)MICROSOFT WINDOWS 7 LEVEL 1 08-01-2015 09-01-2015
     RPP 1 HIV/AIDS AWARNESS (PSY)       08-25-2015 08-25-2015
     BEGINNERS CERAMICS CLASS            06-18-2014 07-23-2014
     SOLID WASTE/RECYCLING TECH          01-27-2014 05-07-2014
     RPP RESUME WRITING                  04-14-2014 05-13-2014
     ACE HOW TO AVOID RECIDIVISM         01-15-2014 04-16-2014
     BODY FAT TEST TRAINING CLASS        02-28-2014 04-04-2014
     RPP ANGER MANAGEMENT                01-26-2014 03-11-2014
     VVCC ASE AUTO SERVICE WRITING       01-08-2014 01-31-2014
     BUSINESS PLAN WRITING               12-09-2013 12-19-2013
     ACE TYPING                          11-20-2013 11-20-2013
     PROFESSOR TEACHES OFFICE 2010  07-11-2013 11-20-2013
     VT SOLAR PANEL TUE/THU/FR 0730 08-05-2013 10-23-2013
     ACE PRACTICAL MONEY SKILLS          10-15-2012 12-21-2012
```

Exhibit 2, Education Transcript. Three of these courses required over 100 hours of study for completion: Solid Waste/Recycling Tech (120); VT Solar Panel (150); and Professor Teaches Office (105). *Id.* In that same time, Mr. Ahmad has a single disciplinary infraction for phone abuse in 2012, shortly after his commitment. *See* Exhibit 3, Summary Reentry Plan – Progress Report.

Beyond the hours he has spent to put his incarceration toward productive ends, Mr. Ahmad has spent the last nine years reflecting on the crime he

committed. As he writes to the Court, "I have come to realize that some of the thoughts and opinions I harbored were indeed doomed to be detrimental. I grew up most of my life in Pakistan where religious groups operate openly and push their beliefs as the[y] deem righteous upon the ignorant masses of people." *See* Exhibit 4, Letter from Jubair Ahmad. In his letter, the Court will see not a trite, self-serving apology – but a reflection on history, religion, and Mr. Ahmad's own relationship with Islam:

> The time you gave me has indeed been a blessing in disguise and has allowed me to learn a lot about my religion without taint, corruption and misrepresentation and I am most thankful for this spiritual enlightenment. Ironically, one of my cellmates, a Sikh gentleman from India by the name of Rai Harminder became one of my good friends and we shared food, laughter and stories, religious views and even worked out together in the yard. My view of life and the world is far different and in contrast now than before my incarceration.

V.      Mr. Ahmad's conditions of confinement cannot be what this Court envisioned in 2012.

Mr. Ahmad has served the last 44 months of his sentence at FCI SeaTac, an administrative facility near Seattle, Washington.[10] The entirety of Mr. Ahmad's family in the United States lives in Virginia; Seattle is 2700 miles away. Even before the current global pandemic, it was impossible for them to visit regularly. Mr. Ahmad has not seen any member of his family in person since October 2019.

Moreover, FDC SeaTac is an Administrative Security Facility, which according to the BOP, " are institutions with special missions, such as the detention of pretrial offenders; the treatment of inmates with serious or chronic medical

---

[10] https://www.bop.gov/locations/institutions/set/

problems; or the containment of extremely dangerous, violent, or escape-prone inmates."[11] However, Mr. Ahmad does not meet any of these criteria: he was at St. Petersburg Low Security facility for years before his transfer to SeaTac. *See* Exhibit 3.

For the last 44 months, Mr. Ahmad has lived in a small, 124-person housing unit. Mr. Ahmad and the other residents do not leave the unit. They do not have access to direct sunlight. This poses a striking contrast to the layouts of any other prison but particularly the low and minimum-security facilities where the Court might have expected Mr. Ahmad to be designated.

The presence of COVID-19 in prisons and the practices BOP has adopted to stop the spread make each day in federal prison punitive and isolating in ways not anticipated by this Court in 2012. At that time, this Court could not have imagined that Mr. Ahmad would spend months, perhaps years, subjected to lockdowns, the elimination of visits and phone use, and the heightened risk of contracting a deadly virus that spreads more quickly through prisons than it does among the general population.[12]

---

[11] https://www.bop.gov/about/facilities/federal_prisons.jsp

[12] According to the BOP's coronavirus information page, as of January 4, 2021, "[t]he BOP has 123,375 federal inmates in BOP-managed institutions and 13,640 in community-based facilities. The BOP staff complement is approximately 36,000. There are 6,775 federal inmates and 1,750 BOP staff who have confirmed positive test results for COVID-19 nationwide." Fed. Bur. of Prisons, *COVID-19 Coronavirus* (last updated Jan. 4, 2021), https://www.bop.gov/coronavirus/. BOP also reports that 39,050 inmates have tested positive. *Id*. Thus, 39,050 inmates have had or have the virus, of the 137,015 inmates total, or approximately ***28.5% of the inmate population***. According to the Census Bureau, the United States population is approximately 330 million. *See* U.S. Census Bureau, *U.S. and World Population Clock* (last updated Jan. 5, 2021), https://www.census.gov/popclock/. There have now been a reported 20,558,489 positive cases in the United States according to

Although Mr. Ahmad does not have any underlying health conditions, young, healthy people are dying from COVID-19 – including a 41 year old man elected to Congress.[13] This is not a theoretical risk: as of January 11, 2021, 111 inmates at FCI SeaTac have active COVID-19, with 147 total considered "recovered": 39% of the prison's inmates have had COVID-19.[14] It is not an impossibility that he becomes severely ill or dies due to the coronavirus—a risk that was not accounted for at the time of his sentencing.

Furthermore, the pandemic has created harsher conditions of confinement inside the already bleak conditions at FCI SeaTac. Across the country, facilities are suspending visitation, making it harder or impossible for inmates to maintain contact with their families, their communities, even their lawyers. Because the facility is currently under lockdown, Mr. Ahmad's unit has been subject to regular lockdowns since last summer with minimal opportunities to interact with other people or contact his family. In light of the global pandemic, courts have considered conditions of confinement and risk in granting compassionate release. *See, e.g., United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) ("The severity

---

the CDC, yielding an infection rate of roughly ***6.2% for the general population***. *See* Ctrs. for Disease Control & Prevention, *United States COVID-19 Cases and Deaths by State* (last updated Jan. 4, 2021), https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days.

[13] Mark Johnson, *The young die as well from COVID-19, even as many engage in denial*, MILWAUKEE J. SENTINEL (Nov. 27, 2020), available at: https://www.jsonline.com/story/news/2020/11/25/fighting-dangerous-myth-covid-only-threatens-old-ill/6389206002/; Diaz, Jaclyn, *Louisiana Congressman-Elect Dies from COVID-19*, NPR (Dec. 30, 2020), available at: https://www.npr.org/2020/12/30/951332740/louisiana-congressman-elect-dies-after-battling-covid-19.

[14] *See* https://www.bop.gov/coronavirus/.

of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to "include incurring a great and unforeseen risk of severe illness or death" brought on by a global pandemic.") (internal citations omitted).

VI.    The ICE detainer results in a longer period of incarceration than a typical 144-month sentence.

As the Court knows, many BOP inmates are released into the community six months prior to their "out date" – either to a halfway house or home confinement. Mr. Ahmad's current home confinement date is May 21, 2021. *See* Exhibit 5, Sentence Computation Data "Home Detention Eligibility Date: 5/21/21".) Because of his immigration detainer, Mr. Ahmad will serve that subsequent six months in custody. Upon Mr. Ahmad's release, he will be transferred to ICE custody before being eventually being deported to Pakistan where he will be reunited with his family.

## Conclusion

WHEREFORE, counsel requests this Court grant his Motion for Compassionate Release to time served.

11

Respectfully Submitted:

By: _____/s/_____

  Nathaniel Wenstrup,
  Assistant Federal Public Defender
  Admitted *Pro Hac Vice*
  1650 King Street, Suite 500
  Alexandria, VA 22314
  Nate_Wenstrup@fd.org
  (703) 600-0825 – direct
  (703) 800-0880 - fax