IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:11-CR-554 (TSE) |
| | ) | |
| JUBAIR AHMAD | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**United States' Response in Opposition to
Defendant's Motion for Compassionate Release**

The Coronavirus is spreading broadly among the U.S. population, including among members of the public, health-providers, law-enforcement officers, people who produce and deliver essential products, and those who carry out the functions of the federal, state, and local governments.  Against this backdrop, the defendant, Jubair Ahmad, seeks early termination of his prison term under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i).  Dkt. No. 71.  The government hereby files its response in opposition to the defendant's motion.  The defendant is serving a 144 month sentence for providing material support to a designated foreign terrorist organization.

The Court should reject the defendant's request.  The defendant has not established an "extraordinary and compelling" reason for compassionate release because, as he concedes, he is young and does not suffer from any underlying health conditions.  Nor does evidence of the defendant's rehabilitation while serving his sentence meet the high bar for relief under § 3582(c)(1)(A)(i).  Further, the defendant has not shown that his risk of contracting COVID-19 would be lower upon release.  He is a national of Pakistan and has a pending Immigration and Customs Enforcement ("ICE") detainer.  Given the ICE detainer, the defendant's proposal would

require the Court to order the early termination of the defendant's sentence and his release to the custody of ICE officials, which would subject him to detention in an ICE facility pending removal to Pakistan.  It is uncertain when the defendant may be removed because widespread travel bans remain in place around the world.  The defendant has also not offered any compelling evidence to demonstrate that if he was returned to his home country, his risk of contracting COVID-19 would be lower than in his Federal Bureau of Prisons ("BOP") facility.

The defendant's current sentence is for an extremely serious crime, and the statutory sentencing factors in 18 U.S.C. § 3553(a) do not support release.  In short, granting compassionate release in his case would fail to address a range of important practical and legal problems and would not satisfy the standards in § 3582(c)(1)(A).

### Background

On December 2, 2011 defendant pleaded guilty to a criminal information charging him with providing material support to a designated foreign terrorist organization ("FTO").  Dkt. No. 41.  The charges involved defendant's efforts in providing material support to Lashkar-e-Taiba ("LeT"), an FTO located in Pakistan that was involved in a number of atrocities around the world, including a deadly terrorist attack in Mumbai, India in 2008 which killed over 160 people.  Dkt. No. 43 at 2.  As part of this crime, the defendant while living in Virginia, communicated with the son of Hafiz Saeed, the leader of LeT.  At the instruction of Hafiz Saeed's son, the defendant prepared and uploaded a video online showing support for jihad and the mujahideen and presenting violent imagery juxtaposed with the sound of Hafiz Saeed reciting a prayer.  *Id.* at 2-3.

On April 13, 2012, the defendant was sentenced to a term of 144 months' imprisonment.  Dkt. No. 51.  The defendant is currently serving his sentence at FCI SeaTac.  According to the

Bureau of Prisons, the defendant's anticipated release date is November 21, 2021.

The defendant submitted a request for compassionate release to the warden of FCI SeaTac on July 13, 2020.  Mot. 4.  The warden denied that request three days later.  Mot. 4.  On January 12, 2021, the defendant filed the instant motion for compassionate release.  Dkt. No. 71. On January 12, 2021, this Court ordered the government to respond by January 27, 2021.  Dkt. No. 72.

## Argument

**I.     The Court should weigh a number of practical considerations in evaluating defendant's request for compassionate release.**

The BOP is actively working to contain the spread of the coronavirus within prisons. BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases— released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[1]  In fact, in his motion, the defendant cites to these very precautions, including lockdowns and COVID-19 restrictions that are "isolating" as reasons to justify his early release.  Dkt. No. 71 at 1, 9.  *See also* Dkt. No. 71 at 10 ( describing regular lockdowns which result in "minimal opportunities to interact with other people").  While this is undoubtedly isolating, it is also likely the most effective way to protect the defendant and others and to stem the spread of the Coronavirus.  Ultimately nothing in the CARES Act provides for the relief the defendant now seeks—early termination of his custodial sentence and release to an

---

[1] *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

ICE facility pending his removal to Pakistan.[2]

BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).  In the instant case, defendant submitted a request for compassionate release to his institution which was promptly denied.  Dkt. No. 71 at 4.  However defendant's requested release plan raises a number of practical concerns, including whether a defendant's home country is willing or able to repatriate citizens who have recently been incarcerated in the United States.  In contrast to the logistical and practical uncertainties surrounding the defendant's proposal to be transferred to ICE custody, BOP has significantly altered operations within federal prisons to implement guidance issued by the Centers for Disease Control and Prevention ("CDC") to manage the transmission of COVID-19.

Since the onset of the COVID-19 pandemic, BOP has adopted measures to contain the spread of the virus within prisons.  In appropriate cases, BOP has released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[3] BOP has also begun vaccinating inmates and staff.  Further, BOP has limited access to prisons, restricted prisoner movement within prisons, required screening and testing, provided masks and hand cleaners, separated ill inmates from the rest of the population, and educated inmates and staff on preventing the spread of disease.

Before Congress enacted the CARES Act, § 3624(c)(2) authorized BOP to "place a

---

[2] It is unclear from the definition provided by the U.S.S.G. whether the release of a defendant to a foreign country would even qualify as "home detention," which is defined as "a program of confinement and supervision that restricts the defendant to his place of residence continuously . . . *enforced by appropriate means of surveillance by the probation office*." U.S.S.G. §5F1.2, Application Note 1 (emphasis added).

[3] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

prisoner in home confinement" only "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months."  As part of the CARES Act, Congress sought to address the spread of COVID-19 in prisons by temporarily authorizing BOP to expand the use of home confinement under § 3624(c)(2).  Accordingly, during the coronavirus emergency, the Act suspends the limitation that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, provided that the Attorney General finds that "emergency conditions will materially affect the functioning" of BOP.[4]  CARES Act § 12003(b)(2).  The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.  Memorandum from Attorney General to BOP Director (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

BOP has been "reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention ("CDC"), to determine which inmates are suitable for home confinement."  *COVID-19 Home Confinement Information*, BOP, https://www.bop.gov/coronavirus/ (last visited DATE).  There are currently 7,787 inmates on home confinement, and the BOP has placed a total of 20,848 inmates in home confinement since March 26, 2020.  *Id.*

Inmates do not have to apply to be considered for home confinement.  BOP considers such factors as the "age and vulnerability of the inmate to COVID-19," consistent with CDC guidelines; the security level of the inmate's facility, giving priority to those in low and minimum security facilities; the inmate's conduct while in prison; whether the inmate has a

---

[4] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

release plan "that will prevent recidivism and maximize public safety"; and the "danger posed by the inmate to the community." Memorandum from Attorney General to BOP Director 1–2 (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf. Additionally, BOP must assess the inmate's risk factors and grant home confinement only after determining that "transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19." *Id.* at 2.  To protect the public against further spread of the coronavirus, BOP requires every inmate granted home confinement to quarantine for 14 days before his release. *Id.*

BOP has also begun administering vaccines to inmates and staff.  After offering the vaccine to all employees, institutions will give priority to inmates assigned to work in health service units and inmates in nursing care centers or other residential care units. *COVID-19 Vaccine Guidance*, BOP 6 (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  Next, priority is given to inmates age 65 or older and inmates of any age who, based on CDC criteria, "are at increased risk" for severe illness from COVID-19 due to one or more medical conditions. *Id.*  The third level of priority for vaccine administration includes inmates between 50 and 64 years old and inmates of any age who, based on CDC criteria, "might be at increased risk" for severe illness from COVID-19 due to one or more medical conditions. *Id.* at 7.  Vaccines will then be available to all other inmates. *Id.*

BOP is also operating under modified conditions to reduce the spread of COVID-19 in its facilities.  All inmates and staff have been issued facial coverings to use, particularly when it is not possible to social distance. *Correcting Myths and Misinformation About BOP and COVID-19*, BOP (May 6, 2020),

6

https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf. Common areas are sanitized multiple times per day. *Id.* at 3. Additionally, medical staff screen every newly admitted inmate for COVID-19. *BOP Modified Operations*, BOP (Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp. Inmates who are asymptomatic and test negative are placed in quarantine for 14 days. *Id.* Inmates who are symptomatic and/or test positive are placed in medical isolation. *Id.*

Medical staff also conduct rounds and check inmate temperatures at least daily. *Correcting Myths and Misinformation About BOP and COVID-19*, at 1. Inmate movements are "limited" to "prevent congregate gathering and maximize social distancing," with movement "in small numbers" permitted to access the commissary, laundry, showers, and phones. *BOP Modified Operations*. Movement is also still permitted for mental health and medical care. *Id.*

Inmates who are transferring between facilities, moving to other correctional jurisdictions, or being released from BOP custody must quarantine for 14 days and test negative before transfer. *Id.* BOP will not transfer or release inmates with active COVID-19 "unless absolutely necessary." *Id.* For immediate releases where the inmate could not quarantine for 14 days, BOP provides a symptom screen, temperature check, and COVID-19 test on the day of departure and notifies the health authorities in the local jurisdiction if necessary. *Id.*

BOP also conducts temperature checks and COVID-19 screening for staff, contractors, and other visitors to its facilities. *Id.* Anyone who registers a temperature of 100.4 degrees Fahrenheit or higher cannot enter the building. *Id.* Staff who exhibit symptoms are sent home. *Correcting Myths and Misinformation About BOP and COVID-19*, at 3.

BOP previously suspended social visits but has since reinstated visits, directing each institution to adopt a visiting plan consistent with its resources, including space. *BOP Modified Operations*. Visits are "non-contact" and must be socially distant, either using physical barriers such as plexiglass or physical distancing. *Id.* Inmates in quarantine or isolation cannot participate in visits. *Id.* Visitors must submit to symptom screening and a temperature check before entering a facility; those who are sick or symptomatic are denied entry. *Id.* Both the inmate and the visitor must wear facial coverings at all times and must perform hand hygiene before and after the visit. *Id.*

Volunteer visits and tours have been suspended. *Id.* Contractors may access BOP facilities to perform "essential services, religious worship services, or necessary maintenance on essential systems," but must complete a COVID-19 screening and temperature check before entry. *Id.*

Additionally, BOP has published extensive guidance to all staff and established a 24/7 hotline to answer staff questions about the virus. *Correcting Myths and Misinformation About BOP and COVID-19*, at 2.

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—defendant envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts. And critically, under defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court order.

8

In any event, the Court's adjudication of the defendant's motion necessarily touches on many of the following fact-specific issues:

- *Avoiding recidivism.* The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points.[5] New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.

- *Protecting the public from infection.* Any release should include measures to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.* Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in one of the 30 BOP facilities and 6 residential reentry centers that BOP is monitoring for coronavirus infections, *See* https://www.bop.gov/coronavirus/;

- *Assessing how much release would affect the particular inmate's health.* To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health.

This list is not exhaustive and, indeed, could include many additional considerations. The key point is that, in light of the BOP's efforts to control the spread of COVID-19, the Court should exercise its discretion in such a way as to grant compassionate release only where the defendant's medical situation, the presence of coronavirus at his facility of confinement, and the statutory sentencing factors support doing so. For the reasons that follow, this is not such a case.

---

[5] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12.

**II.     The Court should in its discretion deny the defendant's request for compassionate release.**

The defendant bears the burden to demonstrate that he is entitled to compassionate release under § 3582(c)(1)(A)(i).  *United States v. Weaver*, No. 1:17-CR-235, 2020 WL 4810123, at \*2 (E.D. Va. Aug. 18, 2020); *see United States v. Morgan*, 473 F. Supp. 3d 544, 547 (D.S.C. 2020); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020); *see also generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise … the burden of persuasion lies … upon the party seeking relief.").  Compassionate release is not appropriate on these facts.

Courts have held that the COVID-19 pandemic, by itself, is not a sufficient basis for compassionate release.  *See, e.g.*, *United States v. Thompson*, No. 20-40381, 2021 WL 37493, at \*3 (5th Cir. Jan. 5, 2021) ("Fear of COVID doesn't automatically entitle a prisoner to release."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release ….."); *see United States v. Miller*, No. 3:16cr121, 2020 WL 4547809, at \*5 (E.D. Va. Aug. 6, 2020) (Defendant "cannot rely merely on a fear of contracting COVID-19 as grounds for compassionate release."  (internal quotation marks omitted)); *United States v. Day*, 474 F. Supp. 3d 790, 805 (E.D. Va. 2020) ("[W]hile the global health crisis is no doubt extraordinary, it affects all prisoners; and the risk of being infected by COVID-19, standing alone, fails to justify an inmate's compassionate release."); *United States v. Feiling*, 453 F. Supp. 3d 832, 842 (E.D. Va. 2020) ("[T]he threat of COVID-19 exists both in- and outside of prison walls, and Defendant's fear of contracting COVID-19 cannot justify his release.").  "Indeed, a general fear of contracting COVID-19, without a sufficient basis for that fear, does not provide an extraordinary and compelling reason for a defendant's release."  *United States v.*

*Chandler*, No. 3:15mj122( (DJN), 2020 WL 6139945, at *5 (E.D. Va. Oct. 19, 2020); *see also United States v. Evans*, No. 3:00cr63, 2020 WL 5121331, at *5 (E.D. Va. Aug. 31, 2020) ("[A] 'fear' of contracting COVID-19[] … will not suffice as an 'extraordinary and compelling' reason for sentence reduction under 18 U.S.C. § 3582(c)(1)(A)."). Instead, "[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. Adamson*, 831 F. App'x 82, 83 (4th Cir. 2020) (per curiam) (quoting *Feiling*, 453 F. Supp. 3d at 841); *see United States v. Blevins*, No. 20-7053, 2020 WL 7691726, at *1 (4th Cir. Dec. 28, 2020) (per curiam).

### A. The defendant has not demonstrated that he faces a particularized susceptibility to COVID-19.

The defendant has not established an extraordinary and compelling reason for compassionate release because he has not shown that he faces a "particularized susceptibility" to COVID-19. *Adamson*, 831 F. App'x at 83. "To establish a particularized susceptibility to COVID-19, courts have required defendants to provide evidence that they suffer from a medical condition identified by the [CDC] as a COVID-19 risk factor." *Chandler*, 2020 WL 6139945, at *5. However, the defendant candidly acknowledges in his motion that he "does not have any underlying health conditions." Dkt. No. 71 at 10. Moreover, he is a young man who was born in 1987. Dkt. 43. Courts consistently have found that defendants who are healthy and taking no prescribed medications do not face a particularized susceptibility to COVID-19. *See, e.g.*, *United States v. Doyle*, No. 3:15cr191, 2020 WL 4590517, at *5 & n.11 (E.D. Va. Aug. 10, 2020) (finding that a defendant who was 39 years old, healthy, took "no medications," and "report[ed] no medical conditions" could not "be considered at an increased risk for severe

11

illness" under the CDC's guidance); *Dinning v. United States*, Nos. 2:12-cr-84, 2:12-cr-140, 2020 WL 1889361, at *3 (E.D. Va. Apr. 16, 2020) (finding that a defendant who was 55 years old, had no history of any serious medical conditions, and was not taking any prescribed medications was not particularly vulnerable to COVID-19).Therefore, the Court should deny the defendant's motion for compassionate release given the defendant's inadequate release plan and the seriousness of the underlying offense.

### B.     The defendant has not demonstrated that he faces a particularized risk of contracting COVID-19 at SeaTac FDC..

The defendant also has not established an "extraordinary and compelling" reason for compassionate release because he has not shown any "particularized risk of contracting the disease at his prison facility." *Adamson*, 831 F. App'x at 83.  The defendant states that, as of January 11, 2021, SeaTac FDC had 111 inmates who were positive for COVID-19 and 147 inmates had recovered.  Mot. 10.  Consequently, he argues that it is "not an impossibility that he [will] become[] severely ill or die[] due to the coronavirus."  Mot. 10.

SeaTac FDC has a total of 662 inmates.  As of January 27, 2021, there are 2 inmates and 10 staff members who are positive for COVID-19.  238 inmates and 26 staff members previously tested positive for COVID-19 and have since recovered.  No inmate or staff member at the facility has died from COVID-19.  These figures illustrate that the number of COVID-19 cases at SeaTac FDC "has steadily declined since Defendant filed his motion." *Day*, 474 F. Supp. 3d.  In other words, the "situation" at SeaTac FDC "is improving, not deteriorating," and the defendant cannot "allege a 'particularized risk' of contracting COVID-19 at this time." *Id.*

Moreover, the defendant has not established any "inadequacies" relating to SeaTac FDC's "protocols," much less "how those inadequacies jeopardize his health." *United States v. Bryant*, No. 4:19cr47-10(DJN), 2020 WL 7497805, at *5 (E.D. Va. Dec. 21, 2020).  SeaTac

12

FDC continues to follow BOP's modified operations plan during the COVID-19 emergency. Indeed, the defendant complains that his facility has taken additional precautions, such as imposing lockdowns. Mot. 10. These mitigation efforts reinforce that the defendant does not face a particularized risk at his facility. *See, e.g.*, *United States v. Beahm*, No. 1:05-CR-249, 2020 WL 4514590, at \*2 (E.D. Va. Aug. 5, 2020) (noting BOP efforts to contain the spread of COVID-19 in concluding that the defendant did not face a particularized risk of contracting the virus).

Further, the defendant's current incarceration does not present a particularized risk of contracting COVID-19 because his release plan does not show that he is less likely to contract COVID-19 outside SeaTac FDC. The defendant asks that he "be immediately transferred to ICE custody and deported to Pakistan." Mot. 1. Removal proceedings are a separate administrative process, and the government cannot predict what will occur once the defendant is in ICE custody. Additionally, the amount of time the defendant may spend in ICE custody awaiting removal is unpredictable given that COVID-19 cases are surging in this country, and it is uncertain whether Pakistan will immediately accept a released prisoner from the United States. In the interim, the defendant has not established that, if granted compassionate release, the ICE facility to which he would be transferred "would provide a safer environment than the BOP as it relates to COVID-19." *United States v. Mariano*, No. 5:14cr7, 2020 WL 5026873, at \*3 n.1 (W.D. Va. Aug. 25, 2020); *see also, e.g.*, *United States v. Henries*, No. 00-788 (SDW), 2020 WL 4727090, at \*3 n.4 (D.N.J. Aug. 14, 2020) (denying motion for compassionate release where it was "not apparent that future custody in an ICE facility, where Defendant [was] likely to be released" would provide a "safer environment"); *United States v. Prelaj*, No. 16-cr-55-1 (RJS), 2020 WL 3642029, at \*3 (S.D.N.Y. July 6, 2020) (denying motion for compassionate release

13

where that relief would likely increase the defendant's "chances of contracting COVID-19, since release from his federal sentence would likely result in Prelaj's transfer to a different, and presumably less healthy, immigration facility due to his immigration detainer").  In fact, the defendant's release will likely increase the risk of exposure for defendant, and anyone with whom he comes into contact, including ICE officials and perhaps corrections officials who may be required to assist in moving him to a new facility.  It is also not clear if the COVID-19 positivity rate in Pakistan would put the defendant in even more danger if he is sent there. Indeed, without the appropriate resources or safety measures in place, release to ICE does not appear to alleviate the very health and safety risks the court, the government, and the defendant are seeking to mitigate.

> **C.** **In the exercise of its discretion, the Court should deny compassionate release in light of the relevant factors.**

Even if the Court determines that the defendant has demonstrated an extraordinary and compelling reason for compassionate release, it should deny the defendant's motion because the statutory sentencing factors weigh against release.  Section 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before reducing a defendant's sentence. Those factors include "the nature and circumstances of the underlying offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the defendant." *United States v. Prater*, No. 3:13cr133 (DJN), 2021 WL 54364, at *4 (E.D. Va. Jan. 6, 2021) (citing 18 U.S.C. § 3553(a)(1)–(2)).  Further, the Sentencing Commission policy statement, U.S.S.G. § 1B1.13, instructs courts to consider the factors set forth in 18 U.S.C. § 3142(g), including "the nature and circumstances of the offense charged …; the history and characteristics of the person …; [and]

the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* (quoting 18 U.S.C. § 3142(g)). Additionally, "the Sentencing Commission has emphasized that a defendant's rehabilitation while incarcerated," by itself, is "insufficient to warrant a sentence reduction." *Prater*, 2021 WL 54364, at *4 (citing U.S.S.G. § 1B1.13, application note 3).Here, these factors counsel against granting a reduction in the defendant's sentence.

The United States has concerns about the defendant's release and the impact of such release on the safety of the community. The defendant did not commit just any crime; he committed a terrorism crime involving an FTO. That FTO, LeT, is based in Pakistan, the very country that the defendant will likely be deported to. Under the § 3553(a) factors, serving out his full sentence will achieve the goal of reflecting the seriousness of this offense, as well as affording adequate deterrence to criminal conduct and protecting the public from further crimes of this defendant. *See* 18 U.S.C. § 3553(a)(2)(A), (B), (C).

The defendant states that he has worked hard to "put his incarceration toward productive ends," and that he has had only a "single disciplinary infraction." Dkt. No. 71 at 7. To be sure, the government credits the defendant for making efforts to improve himself while incarcerated. To that end, the defendant has availed himself of the educational and employment opportunities offered by the BOP, and this should be commended. But in the end, the defendant's evidence of rehabilitation does not amount to an extraordinary and compelling circumstance justifying compassionate release. Congress has expressly directed that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" to grant compassionate release. 28 U.S.C. § 994(t). Therefore, while the defendant's coursework and clean disciplinary record illustrate some progress by the defendant, these efforts at rehabilitation are not enough to

15

support compassionate release. *See, e.g.*, *United States v. Lloyd*, No. 2:11cr36, 2020 WL 4501811, at *4 n.7 (E.D. Va. Aug. 5, 2020) ("While the Court commends Defendant for his documented efforts to work toward rehabilitation during his term of incarceration, his good behavior and pursuit of education in an institutional setting is insufficient to tip the scales in his favor based on the consideration of the record as a whole."); *United States v. Hill*, No. 3:14cr114, 2020 WL 6049912, at *5 (E.D. Va. Oct. 13, 2020) ("While Hill's participation in an extensive number of educational and vocational programs [was] commendable," these measures did "not warrant his early release in light of the seriousness of his convictions and the time remaining on his sentence.")..

For all of these reasons, the defendant has not met his burden of proving that he is entitled to compassionate release and, therefore, his motion should be denied.

*     *     *

Finally, if this Court were to disagree with the government's position above, any order that this Court issues that grants the defendant compassionate release should require the defendant to undergo a 14-day quarantine that BOP controls before any release into the custody of any other government agency, including ICE.

(CONTINUED ON THE FOLLOWING PAGE)

**Conclusion**

For the foregoing reasons, the Court should deny the defendant's motion for compassionate release.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

_____ /s/ _____
John T. Gibbs
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office:   (703) 299-3700
Fax:      (703) 299-3980
Email:    john.gibbs@usdoj.gov

17

**Certificate of Service**

I certify that on January 27, 2021, I filed electronically the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

By:     /s/
John T. Gibbs
Assistant United States Attorney

18